151 F.3d 500
 Prod.Liab.Rep. (CCH) P 15,329
Pamela MORALES, Guardian of Gary Thompson; Bank of the
Bluegrass and Trust Co., Conservator of Gary
Thompson, Plaintiffs-Appellees/Cross-Appellants,
v.
AMERICAN HONDA MOTOR CO., INC.; Honda Motor Co., Ltd.;
Honda R&D Co., Ltd., Defendants-Appellants/Cross-Appellees,
v.
Pamela MORALES, Third-Party Defendant.
 Nos. 96-6670, 96-6699.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 9, 1997.
Decided July 30, 1998.
Rehearing and Suggestion for Rehearing En Banc Denied Oct. 5, 1998.*
 
 Charles C. Adams, Jr. (argued and briefed), Herren & Adams, Lexington, Kentucky, Samuel E. Davies (briefed), Barbourville, Kentucky, for Plaintiffs-Appellees/Cross-Appellants.
 Richard H.C. Clay (argued and briefed), Woodward, Hobson & Fulton, Louisville, Kentucky, Deborah C. Stevens (briefed), Lewis, King, Krieg, Waldrop & Catron, Knoxville, Tennessee, for Defendants-Appellants/Cross-Appellees.
 Thomas B. Bell, Fowler, Measle & Bell, Lexington, Kentucky, for Intervenor-Appellee.
 Before: KENNEDY, JONES, and CLAY, Circuit Judges.
 CLAY, J., delivered the opinion of the court, in which NATHANIEL R. JONES, J., joined. KENNEDY, J. (pp. 519-26), delivered a separate dissenting opinion.
 OPINION
 CLAY, Circuit Judge.
 
 
 1
 American Honda Motor Co., Inc., Honda Motor Co., Ltd., and Honda R & D Co., Ltd. ("Defendants") appeal from the final judgment of the district court, entered on September 23, 1996, and from the district court's November 13, 1996, order denying their motions for judgment after trial and for a new trial. Pamela Morales, Limited Guardian of Gary Thompson, and Bank of the Bluegrass and Trust Company, Conservator of Gary Thompson ("Plaintiffs") cross-appeal from the final judgment and from the district court's November 13, 1996, order denying their motion to amend judgment. For the reasons discussed herein, we AFFIRM the final judgment of the district court and the district court's order denying Defendants' motion for judgment after trial and for a new trial as well as denying Plaintiffs' motion to amend judgment.STATEMENT OF FACTS
 
 
 2
 On March 24, 1993, Pamela Morales filed suit against American Honda Motor Company ("Honda"), seeking damages associated with the severe injuries sustained by her son, Gary Thompson, as he rode his 1988 Honda Z50R motorcycle into the path of an oncoming pickup truck driven by Helen Graham. Thompson was struck by Graham's vehicle when he darted out from an unpaved farm-entrance road onto a two lane country highway in Garrard County, Kentucky. Graham allegedly could not see Thompson nor the motorcycle until immediately before the collision because several bales of hay lined the farm road leading to the highway and obstructed her view of Thompson, who was nine and one-half years old at the time.
 
 
 3
 Morales brought a products liability suit against Honda based upon the theories of strict liability, negligence, and breach of warranty. Specifically, Morales alleged that Honda defectively designed the motorcycle because its small size combined with the lack of a safety flag gave the motorcycle extremely low visibility. Morales also alleged that Honda negligently marketed the motorcycle and negligently failed to warn of its dangerous conditions because Honda did not explain the potential harmful consequences in terms that could be understood by a child.
 
 
 4
 Honda filed a motion for summary judgment, which the district court granted on the grounds that Morales failed to establish a reasonable inference that the alleged defects of the motorcycle were a probable cause of the accident. Morales appealed the decision to this Court, we vacated the district court's decision, and remanded the case for trial on the issues of whether the design of the children's motorcycle was defective, or whether warnings concerning its use were inadequate, and therefore contributed to the cause of the accident. See Morales v. American Honda Motor Co., 71 F.3d 531, 533, 537-39 (6th Cir.1995).
 
 
 5
 Upon remand, the district court permitted Honda to file a third-party complaint against Morales for negligent supervision of Thompson as he operated the motorcycle. The district court also permitted Morales to amend the original complaint to name Honda Motor Company, Ltd. and Honda R & D Company as additional defendants, and to identify the Bank of the Bluegrass and Trust Company as Thompson's Conservator and as co-plaintiff.
 
 
 6
 A jury trial commenced on September 13, 1996, and resulted in a $4,500,000 verdict in favor of Plaintiffs. The jury found for Plaintiffs on their strict liability, negligence, and breach of warranty claims; however, it found for Defendants on Plaintiff's failure to warn claim. Although no percentage of fault was apportioned to Morales, forty-three percent of the fault was apportioned to Thompson. Accordingly, a reduced judgment in the amount of $2,565,000 was entered on September 23, 1996.
 
 
 7
 On October 3, 1996, Defendants filed a motion for judgment after trial pursuant to Fed.R.Civ.P. 50(b), or in the alternative for a new trial pursuant to Fed.R.Civ.P. 59. Plaintiffs filed a motion requesting that the district court amend its judgment to reflect the full amount of damages awarded by the jury. The district court denied these motions on November 13, 1996. Defendants filed a timely notice of appeal, and Plaintiffs filed a timely notice of their cross-appeal.
 
 
 8
 On appeal, Defendants challenge the district court's decision denying their motion for judgment after trial or, in the alternative, for a new trial, on the basis that no evidence was presented for a reasonable jury to have found that the motorcycle was defective and that the defect was the proximate cause of the accident, as well as on the basis that the jury verdict was legally inconsistent. Defendants also claim that the district court made several evidentiary errors below. In their cross-appeal, Plaintiffs argue that the district court erred in reducing the jury's verdict by Thompson's comparative fault.[1]DISCUSSION
 
 I.
 
 9
 Defendants first argue that the district court erred in denying their motion for judgment as a matter of law or, in the alternative, for a new trial because insufficient evidence was presented upon which a reasonable jury could have found that the motorcycle was defectively designed and that the defect was the proximate cause of Thompson's accident.
 
 
 10
 In diversity cases, a state-law standard of review is applied when a Rule 50(b) motion for judgment as a matter of law is based on a challenge to the sufficiency of the evidence necessary to support the jury's verdict. See K & T Enters., Inc. v. Zurich Ins. Co., 97 F.3d 171, 176 (6th Cir.1996). Thus, because this is a diversity case and Defendants' Rule 50 motion challenges the sufficiency of the evidence, we apply the standard of review used by the courts of the state whose substantive law governs the action. See Brocklehurst v. PPG Indus., Inc., 123 F.3d 890, 894 (6th Cir.1997). This action is governed by Kentucky substantive law; therefore, the applicable standard of review is as follows:
 
 
 11
 Under Kentucky law, a motion for a directed verdict--the same thing as a motion for judgment as a matter of law under Rule 50, Fed.R.Civ.P.--should be granted only if "there is a complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable minds could differ." Washington v. Goodman, 830 S.W.2d 398, 400 (Ky.App.1992). In deciding such a question, "every favorable inference which may reasonably be drawn from the evidence should be accorded the party against whom the motion is made." Baylis v. Lourdes Hosp., Inc., 805 S.W.2d 122, 125 (Ky.1991).
 
 
 12
 Adam v. J.B. Hunt Transp., Inc., 130 F.3d 219, 231 (6th Cir.1997).
 
 
 13
 Defendants also challenge the district court's denial of their motion for a new trial made pursuant to Fed.R.Civ.P. 59, on the basis that the verdict was against the great weight of the evidence. "We review a denial of a motion for a new trial for an abuse of discretion." Anchor v. O'Toole, 94 F.3d 1014, 1021 (6th Cir.1996) (citing Gafford v. General Elec. Co., 997 F.2d 150, 171 (6th Cir.1993)). "In diversity cases, we apply federal law in reviewing a denial of a motion for a new trial, '[a]nd, in reviewing a trial court's denial of a new trial motion on the ground that the verdict is against the clear weight of the evidence, we accept the jury's verdict if it was reasonably reached.' " Ridgway v. Ford Dealer Computer Servs., Inc., 114 F.3d 94, 98 (6th Cir.1997) (quoting Anchor, 94 F.3d at 1021).
 
 
 14
 Defendants claim that Plaintiffs failed to present sufficient evidence upon which a reasonable jury could have found for Plaintiffs on a theory of strict liability. That is, Defendants contend that the evidence did not support a finding that the motorcycle was defective and that a defective condition was the proximate cause of Thompson's accident. At trial, Plaintiffs based their strict liability claim on three allegations of design defect: (1) the motorcycle's lack of a safety flag, (2) lack of a key-lock ignition, and (3) the age appropriateness of the vehicle.
 
 
 15
 Kentucky has adopted Section 402A of the Restatement (Second) of Torts (1965). See Dealers Transp. Co. v. Battery Distrib. Co., 402 S.W.2d 441 (Ky.1965). Under Section 402A, the standard for imposing liability upon manufacturers or sellers of products is whether the product is "in a defective condition unreasonably dangerous to the user or consumer." Montgomery Elevator Co. v. McCullough, 676 S.W.2d 776, 780 (Ky.1984). In applying this standard, "[t]he manufacturer is presumed to know the qualities and characteristics, and the actual condition, of his product at the time he sells it, and the question is whether the product creates 'such a risk' of an accident of the general nature of the one in question 'that an ordinarily prudent company engaged in the manufacture' of such a product 'would not have put it on the market.' " Id. (quoting Nichols v. Union Underwear Co., Inc., 602 S.W.2d 429, 433 (Ky.1980)).
 
 
 16
 Under Kentucky law, a plaintiff has the burden of establishing causation in claims of strict liability, as well as in claims of negligence and breach of implied warranty. Morales, 71 F.3d at 537 (citing Huffman v. SS. Mary & Elizabeth Hosp., 475 S.W.2d 631, 633 (Ky.1972); Holbrook v. Rose, 458 S.W.2d 155, 157 (Ky.1970)). Causation or proximate cause is defined by the substantial factor test: was the defendant's conduct a substantial factor in bringing about plaintiff's harm? Id. (citing Deutsch v. Shein, 597 S.W.2d 141, 144 (Ky.1980)). Causation may be proved by circumstantial evidence, but "the evidence must be sufficient to tilt the balance from possibility to probability." Id. (quoting Calhoun v. Honda Motor Co., Ltd., 738 F.2d 126, 130 (6th Cir.1984)).
 
 
 17
 "Lack of a Safety Flag"
 
 
 18
 At trial, Plaintiffs argued that Defendants defectively designed the motorcycle without a safety flag, and that this defect was the proximate cause of the accident. Plaintiffs alleged that if the motorcycle had been equipped with a safety flag, it would have been visible to Graham, and that she could have applied her brakes in time to have avoided the accident. Defendants contend that the evidence at trial did not support Plaintiffs' claim, and thus no reasonable jury could have found that the lack of a safety flag was a proximate cause of the accident. According to Defendants, the evidence indicated that, because of her obstructed view, Graham would not have seen a safety flag even if one had been in place. Defendants also contend that, despite the obstructed view, there was insufficient evidence to find that Graham would have seen the flag and reacted in time to avoid the accident.
 
 
 19
 Based upon the record provided in the joint appendix before us, we find that reasonable minds could differ as to whether the lack of a safety flag was a substantial factor in causing the accident. For example, testimony from Defendants' accident reconstruction expert, Dr. Graeme Fowler, indicated that, even if a safety flag had been present on the motorcycle, he did not believe that Graham would have seen the flag, perceived that there was going to be a collision, and decided that it was necessary to actually react and hit the brakes in sufficient time to avoid the accident. (Fowler Tr. at 43; J.A. at 329.) Dr. Fowler therefore concluded that a safety flag on the motorcycle would not have prevented this accident. (Fowler Tr. at 30; J.A. at 327.)
 
 
 20
 However, testimony from Plaintiffs' expert, Bill Kitzes, may have led a reasonable juror to find otherwise, particularly where jurors were free to give greater credibility to whichever expert they chose. The testimony provided in the joint appendix indicates that Kitzes espoused his opinion as to the appropriateness of a safety flag when he was questioned as to whether he had any criticisms as to how the motorcycle was marketed. Kitzes responded that, in his opinion, the motorcycle should have been marketed with a safety flag. (Kitzes Tr. at 21; J.A. at 286.)
 
 
 21
 Where the jury was free to determine which expert to believe, this Court should not disturb the jury's decision. See Black v. Ryder/P.I.E. Nationwide, Inc., 970 F.2d 1461, 1471 (6th Cir.1992). Therefore, in viewing the evidence in a light most favorable to Plaintiffs, we conclude that reasonable minds could have differed as to whether a lack of a safety flag was the proximate cause of the accident.
 
 
 22
 "Lack of Key-Lock Ignition"
 
 
 23
 Plaintiffs also argued that Defendants designed the motorcycle without a key-lock, and that this defect was the proximate cause of the accident. Simply put, Plaintiffs argued that if the motorcycle was manufactured with a key-lock ignition, instead of a kick start ignition, Morales could have held onto the key and not allowed Thompson to ride the motorcycle without her permission. Plaintiffs gave this argument little attention below, where the only evidence presented was by way of Kitzes, who, when asked for criticism as to how the motorcycle was marketed, stated:
 
 
 24
 Number two is, to help the parents maintain control, they could use a key start instead of a kick start. So if the parent takes the key and puts it away, the vehicle can't be used without the adult's approval. And that's something that could be done to assist parents in supervising the use of the product.
 
 
 25
 (Kitzes Tr. at 21; J.A. at 286.)
 
 
 26
 We find that such a generalized and conclusory statement does not rise to the level of establishing that this alleged defect was a proximate cause of the accident, where the jury was required to speculate and surmise. See Midwestern V.W. Corp. v. Ringley, 503 S.W.2d 745, 747 (Ky.1973). For example, in order for this theory to hold true, one must assume that, had Morales given Thompson the key and allowed him to ride the motorcycle, she would have supervised him constantly. Although the joint appendix indicates that Morales supervised Thompson as he used the motorcycle, there is no evidence to show she constantly supervised Thompson every moment that he used the motorcycle. Therefore, there is no evidence from which a reasonable juror could have inferred that, had Morales allowed Thompson to ride the motorcycle on the day in question, he never would have rode the bike out of her sight, and the accident would not have occurred. Further, in order to accept this theory, one must also assume that Thompson would not have been able to get the key and use it without Morales' permission, and there is nothing in the joint appendix to satisfy such an assumption.
 
 
 27
 Therefore, because the evidence provided on this theory was slight and based upon speculation, Plaintiffs failed to show that the lack of a key-start ignition on the motorcycle was a proximate cause of the accident. See Ringley, 503 S.W.2d at 747.
 
 
 28
 "Age Appropriateness of the Vehicle"
 
 
 29
 Plaintiffs further argued that the motorcycle was defective because, although it was recommended for use by children over age seven, the evidence indicated that children under age twelve are incapable of handling a motorcycle safely. Specifically, Plaintiffs argued that children between the ages of seven and eleven are unable mentally to simultaneously perform the multiple tasks necessary to properly operate the motorcycle at issue. Accordingly, Plaintiffs concluded that the motorcycle was not appropriate for nine-and-one-half-year-old Thompson, and that Morales would never have bought the motorcycle if it had had the proper age warning.
 
 
 30
 Defendants contend that the evidence presented at trial was insufficient to support Plaintiffs' theory. Defendants maintain that the expert testimony was too general, and was sufficiently rebutted by the fact that Thompson had been riding the motorcycle without incident for three years before the accident occurred. Defendants therefore conclude that Thompson was capable of safely operating the motorcycle, but chose to mishandle the bike on the day in question by failing to stop and look for oncoming traffic before entering the highway.
 
 
 31
 Contrary to Defendants' assertions, the Court finds that Plaintiffs presented sufficient evidence for a reasonable jury to have found that Thompson's inherent inability to concentrate on the multiple tasks necessary to safely operate the motorcycle was a substantial factor in causing the accident. For example, Plaintiffs' expert witness, Dr. Karen DeMoss, a psychologist, testified that children Thompson's age are "not at a stage cognitively where they're capable of handling a machine with th[e] sort of skill that's required with regards to speed, depth perception, remembering rules, and operating the motorcycle at the same time." (DeMoss Tr. at 24; J.A. at 246.) Dr. DeMoss further testified that the motorcycle had "too many factors and variables that ... have to [be taken] into account" by children Thompson's age, because they typically could only carry out one task at a time without becoming confused. Id. Dr. DeMoss went on to state that, given children's developmental skills, it is unlikely that a small child riding on a gravel road would even recognize an upcoming change in the pavement, and explained that children Thompson's age are "focusing on what's on the end, they're not looking, they're not scanning the environment, which is required when you ride a motorcycle." Id. at 246-48.
 
 
 32
 Dr. DeMoss' testimony was consistent with the manner in which the accident at hand occurred. Thompson's actions of darting out onto the public highway, apparently without even attempting to brake, suggests that he was not paying attention to his surroundings while riding his motorbike. As such, a jury could reasonably find from this evidence that the defect in the motorcycle, i.e., a design which required a nine-year-old to focus on multiple tasks simultaneously, was a proximate cause of the accident. See Deutsch, 597 S.W.2d at 144.
 
 
 33
 For the foregoing reasons, we find that there was sufficient evidence to support the jury's verdict on at least two of Plaintiffs' design defect theories. Therefore, the district court properly denied Defendants' motion for judgment after trial or, in the alternative, for a new trial.
 
 II.
 
 34
 Defendants next argue that the district court erred in denying their motion for judgment after trial or, in the alternative, for a new trial on the basis that jury's verdict was legally inconsistent. When faced with a claim that a verdict is inconsistent, "we look for a reasonable way to read the answers to interrogatories as expressing a coherent and reasonable view of the case." Tipton v. Michelin Tire Co., 101 F.3d 1145, 1148 (6th Cir.1996) (citing Gallick v. Baltimore & O.R. Co., 372 U.S. 108, 119, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963)). "We make this consistency determination by referring to the jury charge and the total context of the special verdict." Id. While Kentucky law determines what constitutes an inconsistent verdict, federal law determines the procedure to be used to remedy the inconsistency. Id. at 1148 n. 4.
 
 
 35
 Defendants claim that the jury verdict is legally inconsistent because, based upon the jury's findings that (1) the motorcycle was defective and unreasonably dangerous; (2) that Defendants failed to exercise ordinary care in the design and sale of the motorcycle; and (3) that Defendants breached their express and implied warranties, it was legally inconsistent for the jury to find that Plaintiff failed to prove by a preponderance of the evidence that Defendants' directions and warnings of potential dangers were inadequate.
 
 
 36
 Here, with regard to the failure to warn claim, the district court instructed the jury as follows:
 
 
 37
 Plaintiffs also allege that Honda negligently failed to use reasonable care to provide adequate directions and warnings of potential dangers associated with the 1988 Z50R Motorcycle. Specifically, plaintiffs claim that Honda did not sufficiently warn of the allegedly unreasonable dangerous design of the motorcycle after Honda supposedly knew or should have known that the motorcycle's design was purportedly defective. Plaintiffs contend that alleged failure to warn caused the accident and the injuries that Gary Thompson sustained.
 
 
 38
 It was Honda's duty to use reasonable care to provide adequate directions for use and adequate warnings of potential dangers associated with the use, or foreseeable misuse, of the 1988 Z50R Motorcycle where it either knew or should have known about the potential danger. If you are satisfied from the evidence that Honda failed to comply with this duty and that such a failure was a substantial factor in causing Gary Thompson's injuries, you will find for the plaintiffs as to this claim; otherwise, you will find for Honda.
 
 
 39
 An "adequate warning," as used in this Instruction, means such degree of warning as may be necessary to provide by the exercise of reasonable care, fair and adequate notice of the consequences of use or reasonably foreseeable misuse of the product.
 
 
 40
 In determining whether inadequate directions or warnings were a substantial factor in causing Gary Thompson's injuries, you should consider whether he would have acted in the same manner, had adequate directions or warnings been given. If he would have acted in the same manner in light of proper directions or warnings, then the allegedly inadequate directions or warnings cannot be said to be a substantial factor in causing his injuries.
 
 
 41
 (J.A. at 206-07.) The jury was to rely upon this instruction when it answered the corresponding interrogatory on this claim:As set forth in Instruction 11, do you find, by a preponderance of the evidence, that Honda negligently failed to use reasonable care to provide adequate directions and warnings of potential dangers associated with the 1988 Z50R Motorcycle and that Honda's alleged failure to warn was a substantial factor in causing the accident and the injuries that Gary Thompson sustained?
 
 
 42
 (J.A. at 219.)
 
 
 43
 Based upon this broad instruction and compound interrogatory, the grounds upon which the jury answered this claim in the negative are unclear. For example, the jury may have found that Defendants negligently failed to use reasonable care to provide adequate warnings of potential dangers associated with the motorcycle, but that this failure to warn was not a substantial factor in causing the accident because Thompson "would have acted in the same manner in light of proper directions or warnings." Or, on the other hand, the jury may have found that Defendants did use reasonable care to provide adequate directions for use and adequate warnings of potential dangers associated with the use of the motorcycle.
 
 
 44
 Defendants' claim on this issue, that the jury's answer to this question is fatally inconsistent with its answers on Plaintiffs' strict liability, negligence and breach of warranties claims, is premised upon the latter possible interpretation of answers. Defendants' arguments all require the court to assume that the jury found that the warnings were adequate, and therefore inconsistent with the jury's other findings. However, because it is our duty to "look for a reasonable way to read the answers to interrogatories as expressing a coherent and reasonable view of the case" when considering an inconsistent verdict claim, we must accept the first possible interpretation of answers. Tipton, 101 F.3d at 1148. In doing so, Defendants' claim that the verdict is legally inconsistent fails.
 
 
 45
 For example, Defendants' first allegation of conflict is that, because the jury found that the warnings were adequate, it was legally inconsistent for the jury to find that Defendants breached their express and implied warranties, where both theories of recovery were premised upon the age appropriateness of the vehicle. However, when interpreting the jury's answer to the interrogatory as being that Defendants failed to provide the proper warnings, but that this failure was not a substantial factor in causing the accident because Thompson would have acted in the same manner, the verdict is consistent with a finding that Defendants breached their express and implied warranties, even assuming, arguendo, that both theories of recovery were based solely upon age appropriateness. In other words, a finding that the warnings as to age appropriateness were inadequate, but that Thompson would have acted in the same manner in light of proper warnings, is consistent with the jury's finding that Defendants breached their express and implied warranties. The fact that Thompson may not have changed his behavior had adequate warnings been given, is not inconsistent with a finding that Defendants breached their warranty that the motorcycle was safe for use by riders seven years of age and older.
 
 
 46
 Defendants' second allegation of inconsistency also fails in light of our interpretation of the jury's verdict. Defendants contend that because both the warnings instruction and the negligence instruction contained virtually identical definitions of "adequate warning," the jury's finding that the warnings were adequate is legally inconsistent with the jury's finding that Defendants failed to exercise ordinary care in designing and selling the motorcycle. However, when interpreting the verdict on the warnings claim to mean that the jury found the warnings inadequate, but this inadequacy was not a substantial factor in causing the accident because Thompson would not have changed his behavior in light of proper warnings, Defendants' argument fails. The fact that Thompson may have ignored the adequate warnings is not inconsistent with a finding that Defendants failed to exercise ordinary care in the design and sale of the motorcycle.
 
 
 47
 Finally, Defendants' third allegation of fatal inconsistency between the jury's finding on the strict liability claim, and its finding on the failure to warn claim also fails in light of our interpretation of the jury's verdict. Even assuming (as Defendants invite us to do) that the jury found for Plaintiff on the strict liability issue on the basis that the design was defective for children of the age for which it was sold, and that the failure to warn claim was solely based upon age appropriateness, does not render the verdict inconsistent when one considers that the jury may have found that the warnings were inadequate, but that Thompson would have ignored them even in light of adequate warnings.
 
 
 48
 Again, given our duty to look for a reasonable way to read the answers to interrogatories as expressing a coherent and reasonable view of the case when considering a claim that the verdict is inconsistent, we find that our interpretation of the jury's answer to the interrogatory on the failure to warn claim is consistent with its findings on the strict liability, negligence and breach of warranty claims. See Tipton, 101 F.3d at 1148. Accordingly, we conclude that the district court did not err in denying Defendants' motion for a judgment as a matter of law or for a new trial on this issue.
 
 III.
 
 49
 Next, Defendants make several allegations of evidentiary errors. Specifically, Defendants challenge (1) whether the court properly admitted into evidence motorcycle related accident statistics from the Consumer Product Safety Commission ("CPSC"); (2) whether the court properly excluded evidence of the CPSC's denial of a petition for rule making regarding motorcycles; (3) whether the court properly permitted an unqualified expert to testify at trial; and (4) whether the court properly admitted evidence of a "WindWhip" advertisement.
 
 
 50
 "Motorcycle-Related Accident Statistics"
 
 
 51
 Prior to voir dire in this case, the district court denied Defendants' motion in limine to exclude evidence of and prohibit all reference to CPSC statistics compiled on minibike-related injuries. Defendants contend that the district court improperly admitted a CPSC publication entitled "Hazard Analysis of Mini-Bike Related Injuries" into evidence. Defendants maintain that, because none of the statistics were representative of accidents that occurred with the motorcycle in question in children nine to twelve years of age, and because the evidence was based upon unreliable data, it should have been excluded. Plaintiffs argue that Defendants' claim regarding the reliability of the report is disingenuous, where Honda relied upon the same CPSC report in prior litigation. Plaintiffs further contend that, because the district court only allowed accident data pertaining to the small, two-wheeled class of minibikes into evidence, and refused to allow Plaintiffs to introduce accident data comparing minibikes with all-terrain vehicles, the evidence was not unduly prejudicial.
 
 
 52
 We review a district court's decision to admit or to exclude evidence of prior accidents as follows:
 
 
 53
 In reviewing the exclusion [or inclusion] of evidence concerning prior accidents or incidents, our standard of review is whether the District Court abused its discretion. Under this standard, "the relevant inquiry is not how the reviewing judges would have ruled if they had been considering the case in the first place, but rather, whether any reasonable person could agree with the district court." We are guided by the principles that "heavy reliance is placed on the discretion of the trial judge" in admitting or excluding evidence of prior accidents, and the trial judge's decision is to be given "great latitude." A "strong showing of abuse" is required for us to disturb the District Court's judgment.
 
 
 54
 Rye v. Black & Decker Mfg. Co., 889 F.2d 100, 101 (6th Cir.1989) (citations omitted).
 
 
 55
 Here, based upon the record before us, we find that the district court did not abuse its discretion in allowing the CPSC publication into evidence. The record supports Plaintiffs' contention that the district court disallowed all evidence and any reference to all-terrain vehicles. (J.A. at 180, 250-51.) Although the parties did not provide documentation in the joint appendix of the district court's decision to limit admittance of the CPSC's accident data to small, two-wheeled class of motorbikes, testimony from witnesses regarding this evidence supports Plaintiffs' contention that the court did limit the evidence in such a fashion. For example, testimony from Dr. DeMoss indicates that she relied upon the studies in the publication to determine the basic cognitive skills required to operate a basic minibike or motorcycle in order to assess at what age children could safely operate such a vehicle. (DeMoss Tr. at 53-54; J.A. at 258-59.) In addition, testimony from Kitzes also indicates that he relied upon the information regarding minibikes to establish the age appropriateness argument. (Kitzes Tr. at 34-35; J.A. at 292-93.)
 
 
 56
 Defendants are correct in stating that evidence of prior accidents must be "substantially similar" to the one at issue before such evidence may be admitted. However, we find that, where the district court limited the accident statistics at issue to minibikes and small vehicles of the same sort, then the "substantially similar" requirement was met because it may be said that these vehicles perform a similar purpose. See Bittner v. American Honda Co., Inc., 194 Wis.2d 122, 533 N.W.2d 476, 484-85 (Wis.1995). The Court finds that this is particularly so where the evidence was used to develop Plaintiffs' age appropriateness argument. Id. (finding that use of CPSC study comparing three and four wheel ATVs (all-terrain vehicles) was appropriate because these products, though different in design, were intended for a similar purpose and the information was relevant to establishing that Honda may have reasonably designed a safer vehicle); accord Brock v. Caterpillar, Inc., 94 F.3d 220, 225-26 (6th Cir.1996) (finding that magistrate judge committed prejudicial error in allowing expert's testimony comparing bulldozers that were substantially different). Under these facts, we cannot conclude that a "strong showing of abuse" has been made regarding the district court's decision to admit this evidence.
 
 
 57
 "Denial of Petition for Rule-Making"
 
 
 58
 Defendants next challenge the district court's ruling prohibiting them from introducing evidence of a report from the CPSC denying a petition to regulate unlicensed two-wheeled motorized vehicles. "The petition requested design and labeling requirements to address the risk to children under age 14 from these off-road vehicles." (Defendants' Exhibit 28; J.A. at 178.) The CPSC report stated that "[t]he Commission's denial [was] based on the fact that the vast majority of injuries associated with these vehicles are related to the way they are used and not to design characteristics which the Commission could effectively or practically regulate." Id.
 
 
 59
 Defendants claim that the petition should have been introduced, particularly in light of the district court's decision to admit evidence of the CPSC accident statistics. Defendants argue that the combined effect of the district court's rulings on the accident statistics and the denial of the rule-making petition was to allow Plaintiffs to introduce irrelevant statistics without allowing Defendants an opportunity to rebut the same. Plaintiffs claim that the district court properly excluded this evidence in light of 15 U.S.C. § 2074(b) that expressly prohibits the introduction of evidence regarding the CPSC's inaction relating to consumer products into trial. However, Defendants claim that, even if Plaintiff's contention is true, once Plaintiffs were allowed to introduce evidence of the accident statistics, they opened the door to the introduction of otherwise inadmissible evidence.
 
 
 60
 The district court refused to allow Defendants to admit this report into evidence based upon the language of § 2074(b). However, in doing so, the court expressed its displeasure in applying the statute with wooden literalness:
 
 
 61
 I am aware of the statute [15 U.S.C. § 2074(b) ], I've had it in other cases. But I'm not sure it's as clear as it would seem to be, just reading the statute....
 
 
 62
 I believe there is an exception to this very clear language here, but I haven't been into this in a year or so. If there is not an exception, I will say what I said, and have said; is [that] this statute is unbelievable, it allows a so-called expert to come in, invoke whatever good name the Consumer Products Safety Council [sic] might have, and give statistical information and all this. And then you can't ask the simple question, "Well, if it was so bad, why didn't the Consumer Products Safety Counsil [sic] do something about it?" The statute says you can't ask that question.
 
 
 63
 (J.A. at 251-52.)
 
 
 64
 We review the factual components of a district court's evidentiary determinations under the abuse of discretion standard, but we review the legal components of these determinations de novo. Miller v. Field, 35 F.3d 1088, 1090 (6th Cir.1994). Therefore, we review de novo the district court's legal determination, that the CPSC's denial of the rule-making petition constituted a "failure of the Commission to take any action or commence a proceeding" under § 2074(b) and was thus subject to exclusion.
 
 
 65
 15 U.S.C.A. § 2074(b) (West 1998) provides:
 
 
 66
 The failure of the Commission to take any action or commence a proceeding with respect to the safety of a consumer product shall not be admissible in evidence in litigation at common law or under State statutory law relating to such consumer product.
 
 
 67
 In Johnston v. Deere & Co., 967 F.Supp. 578, 580 (D.Me.1997), the district court in Maine examined the legislative history of § 2074(b) and concluded that:
 
 
 68
 The most reasonable reading of section 2074(b), therefore, is that it is referring to the complete failure by the CPSC to engage in activity on a product; that failure is not to be introduced into evidence as somehow implying that a particular product is not unsafe. Where the CPSC had engaged in activity, on the other hand, those activities are admissible even if they lead ultimately to a decision not to regulate, just as an ultimate decision to regulate is admissible under subsection (a). They are not "failure ... to take any action."
 
 
 69
 In reaching this conclusion, the Johnston court noted that there is an inherent ambiguity in the language of § 2074(b); namely, "[d]oes 'failure ... to take any action' mean utter failure to act--i.e., total absence of any action at all on the part of the Commission? ... Or does 'failure ... to take any action' mean failure to do something effective in a legal sense, like failing to promulgate a rule or standard?" Johnston, 967 F.Supp. at 579. Upon examination of the holding in Johnston regarding the legislative intent behind § 2074(b), this Court agrees that "the most reasonable reading" of this section leads to a conclusion that Congress sought to exclude those instances where the CPSC had completely failed to act, as opposed to those instances where the CPSC engaged in activity that ultimately led to a decision not to regulate. Id. at 580.
 
 
 70
 Section 2074(a) provides that compliance with an adopted CPSC rule "shall not relieve any person from liability at common law or under State statutory law." As noted by the Johnston Court, the legislative history behind this section confirms that it was expected that such compliance would be admitted as evidence, but would not be determinative of the outcome. Johnston, 967 F.Supp. at 580. (citing National Commission on Product Safety, Final Report Presented to the President and Congress, June 1970 at 76). The Johnston court then noted that, as such, had the Commission adopted the proposal in question in that case, it would have come into evidence. Id. Accordingly, the court reasoned that, under § 2074(b), the fact that the CPSC had decided not to adopt the proposal should not change the outcome, i.e., the proposal should have been allowed into evidence. Id. The court concluded that this interpretation of § 2074(b) was in line with Congress' recognition "that the new Commission it had established would be confronting thousands of consumer products, most of which it could not pay any attention to, at least for a long while," and that the limitations of the new Commission should not impede common law litigation. Id.
 
 
 71
 We agree with the Johnston Court's interpretation of § 2074(b), and therefore hold that the district court erred in finding that the CPSC's denial of the rule-making petition seeking to ban motorbikes was precluded from evidence under this section. The report in question was not evidence of the CPSC's inaction; rather, it was evidence of the CPSC's action in denying the rule-making petition; therefore, admittance of the report into evidence was not barred by § 2074(b). See Johnston, 967 F.Supp. at 579-80.[2]
 
 
 72
 Although we find that the district court abused its discretion in excluding this report from evidence, we do not find that a new trial is warranted. Even if a mistake has been made regarding the admission or exclusion of evidence, a new trial will not be granted unless the evidence would have caused a different outcome at trial. See Nida v. Plant Protection Ass'n Nat., 7 F.3d 522, 527 (6th Cir.1993); see also Fed. R. Civ. P. 61.[3] Because the district court limited evidence of the accident statistics and because the statistics were used to support only one theory of Plaintiffs' alleged design defects (age appropriateness), we conclude that exclusion of the CPSC's denial of the rule-making petition seeking to ban motorbikes would not have changed the outcome at trial. Admittance of the report was not necessary to rebut the accident statistics where they were admitted for a limited purpose. Therefore, a new trial is not warranted. Id.; see Porter v. Lima Hosp., 995 F.2d 629, 637 (6th Cir.1993) (even if erroneously admitted, given the generalized nature of the expert's testimony, a new trial was not warranted because the testimony did not substantially impair the plaintiff's right to a fair trial).
 
 
 73
 "Testimony of an Alleged Unqualified Expert"
 
 
 74
 Next, Defendants argue that the district court improperly denied their request for a Rule 702 hearing regarding the qualifications of Plaintiffs' expert witness Kitzes, and improperly allowed this witness to testify as an expert. We disagree.
 
 
 75
 Federal Rule of Evidence 702 states the requirements for admissibility of expert testimony:
 
 
 76
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
 
 
 77
 Traditionally, this circuit has reviewed a district court's ruling regarding the admissibility of expert testimony under Rule 702 for an abuse of discretion. See, e.g. American & Foreign Ins. Co. v. General Elec. Co., 45 F.3d 135, 137, 139 (6th Cir.1995); Mannino v. International Mfg. Co., 650 F.2d 846, 849 (6th Cir.1981) (a trial court's decision to allow an expert to testify will not be disturbed on appeal unless clearly erroneous or an abuse of discretion). However, in Cook v. American S.S. Co., 53 F.3d 733, 738 (6th Cir.1995), a panel of this court stated that this traditional standard oversimplified the proper approach in reviewing such decisions. Instead, the Cook court proffered a novel three-part standard of review concerning a trial court's rulings on the admissibility of expert opinion testimony under Fed.R.Evid. 702, depending upon the assignment of error. Id. Specifically, the three-part standard of review espoused in Cook requires that (1) the trial court's preliminary fact-finding under Rule 104(a) be reviewed for clear error; (2) the trial court's determination whether the proposed expert opinion is properly the subject of "scientific, technical, or other specialized knowledge" be reviewed de novo as a question of law; and (3) the trial court's determination whether the proffered expert opinion "will assist the trier of fact to understand the evidence or to determine a fact in issue" be reviewed for an abuse of discretion. Id.
 
 
 78
 Although other panels of this court have since cited the Cook standard of review[4], we note that a recent decision from this court called the Cook standard into question. See United States v. Jones, 107 F.3d 1147, 1150-56 (6th Cir.1997). After a lengthy analysis of the applicability and viability of the three-part standard, the court in Jones concluded that it was unnecessary for the majority to decide whether the Cook standard presented a direct conflict with prior decisions of this circuit (and therefore should not be followed), in light of the fact that the court's conclusion as to the issue in question would be the same regardless of whether the de novo or abuse of discretion standard was applied. Jones, 107 F.3d at 1155-56 (citing Pfeiffer v. Marion Ctr. Area Sch. Dist., 917 F.2d 779, 781 (3d Cir.1990)). Therefore, the Jones court concluded that the task of resolving the precise standard of review on this issue would best be left to future panels where the application of one standard of review over another would be outcome determinative. Id. However, in light of the Supreme Court's recent holding in General Elec. Co. v. Joiner, 522 U.S. 136, ----, 118 S.Ct. 512, 515, 139 L.Ed.2d 508 (1997), that abuse of discretion is the appropriate standard to apply in reviewing a trial court's decision to admit or exclude expert testimony, the conflict is put to rest. We will therefore review the district court's decision under this standard.
 
 
 79
 Defendants argue that the district court improperly substituted its personal knowledge of Kitzes' qualifications in place of a Rule 702 hearing. In support of their position, Defendants rely upon Kingsley Assoc. Inc. v. Del-Met, Inc., 918 F.2d 1277, 1286 (6th Cir.1990), where this court found that, "[w]hile a proposed expert witness' qualification to testify 'in the form of an opinion or otherwise,' Fed.R.Evid. 702, is unquestionably a preliminary factual determination for the trial court, Fed.R.Evid. 104(a), it is a determination which must be made upon the evidence of the witness' qualifications, or lack thereof, and not upon the trial court's personal views." We find Defendants' reliance upon Kingsley misplaced where the facts of that case are easily distinguishable.
 
 
 80
 In Kingsley, the district court found the proposed expert unqualified to testify without hearing any evidence regarding the witness' qualifications, or the lack thereof, to make this determination. Kingsley, 918 F.2d at 1286. There was no evidence received regarding the witness' qualifications on the subject and the court's ruling was made entirely on the court's personal impression of the manner in which the industry at issue functioned. Id. This court found that the district court erred in making such "a sua sponte finding unsupported by any evidence that the proposition the plaintiff wished to prove was unprovable through opinion testimony." Id.
 
 
 81
 Unlike in Kingsley, the district court in the instant case heard testimony regarding Kitzes' credentials and qualifications to testify as an expert in the area of product safety. (Kitzes Tr. at 2-3; J.A. at 279-80.) For example, Kitzes testified that he held a certificate in safety management from the American Society of Safety Engineers; that he was a member of the American Society of Safety Engineers, the Human Factors Society, the Board of Product Safety Management, the Board of Certified Product Safety Management, the Certified Hazard Control Management, and the Systems Safety Society; and that he was certified in the area of Products Safety Management. Id. In addition, Kitzes testified that, after graduating from law school, he worked in the Office of Product Defect Identification for the CPSC. Id.
 
 
 82
 Under these circumstances, we conclude that the district court properly qualified Kitzes as an expert. See Mannino, 650 F.2d at 850 (finding that the trial judge must investigate the competence a particular proffered witness would bring to bear on the issue without relying upon any particular label or fact, and must determine whether it would aid the trier of fact in reaching a decision). The safety of the motorcycle was clearly at issue in this case, and Kitzes' expert opinion would, therefore, have aided the jury in reaching its verdict. Id. Furthermore, contrary to Defendants' assertions, a district court is not required to hold a formal hearing to determine whether a person is qualified to be a witness; rather, the court must merely make a determination as to the proposed expert's qualifications. See Hopkins v. Dow Corning Corp., 33 F.3d 1116, 1124 (9th Cir.1994).
 
 
 83
 Defendants also contend that the district court impermissibly allowed Kitzes to testify beyond the scope of his alleged expertise. Specifically, Defendants claim that Kitzes was allowed to testify regarding accident reconstruction, engineering, and child psychology despite the fact that he has no background in any of these areas. We disagree.
 
 
 84
 In Davis v. Combustion Eng'g, Inc., 742 F.2d 916 (6th Cir.1984), this court stated that:
 
 
 85
 Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact. The fact that a proffered expert may be unfamiliar with pertinent statutory definitions or standards is not grounds for disqualification. Such lack of familiarity affects the witness' credibility, not his qualifications to testify.
 
 
 86
 Id. at 919 (emphasis added). The court went on to find that, because opposing counsel was provided, and took full advantage of, the opportunity to challenge the expert's qualifications to testify in the area in question, as well as the fact that the court instructed the jury that they were to determine the weight and credibility of the witness' testimony, the trial court did not err in allowing the expert to testify. Id.
 
 
 87
 Likewise, in the instant case, defense counsel cross-examined Kitzes regarding his qualifications to testify in the areas in question, and the district court instructed the jury that they were to determine the weight and credibility to be given Kitzes' testimony. (J.A. at 199, 288.) Therefore, the jury was free to give Kitzes' testimony as much credence as it felt the testimony deserved, particularly in light of Defendants' cross-examination exposing Kitzes' lack of familiarity with the given topics. As such, we conclude that Defendants' claim on this issue must fail. See Davis, 742 F.2d at 919.
 
 
 88
 " 'WindWhip' Advertisement"
 
 
 89
 Defendants final allegation of evidentiary error is that the district court improperly admitted a Honda "WindWhip" advertisement into evidence. We disagree.
 
 
 90
 The advertisement indicated that, in 1973, Honda offered a free "WindWhip" for Christmas with the purchase of a Honda motorbike. (Plaintiffs' Exhibit 12; J.A. at 323.) The advertisement referred to the WindWhip as a "safety flag for everyone," and stated that "[b]esides being crazy and fun, the WindWhip ma[de] younger riders easier to spot" and "help[ed] older street riders stand out and be seen in traffic." Id. The district court admitted the advertisement "as evidence of the availability of wind flags and of Honda's use of wind flags on similar models." (J.A. at 76.) The district court found the advertisement relevant "because the absence of a wind flag was one of the grounds on which plaintiffs rested their strict products liability argument." Id.
 
 
 91
 Defendants object to the district court's admission of this evidence on relevancy grounds. Defendants argue that to be relevant and admissible, the advertising must have been demonstrably relied upon by Plaintiffs, and because Plaintiffs failed to prove such reliance, the district court abused its discretion in admitting the evidence.
 
 
 92
 The standard of review for the admission of evidence where relevance is at issue is abuse of discretion, which exists when the reviewing court is firmly convinced that a mistake has been made. See United States v. Wiedyk, 71 F.3d 602, 609 (6th Cir.1995). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401.
 
 
 93
 Here, we find that the district court did not abuse its discretion in admitting the "WindWhip" advertisement into evidence because, among other things, the advertisement aided in establishing causation, knowledge, feasibility, and industry standards--issues attendant to Plaintiffs' negligence and strict liability claims. Accordingly, because this evidence had the tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would have been without it (Plaintiffs' negligence and strict liability claims), evidence of the advertisement was relevant. Fed.R.Evid. 401.
 
 
 94
 We are not persuaded otherwise by Defendants' argument that the advertisement was not relevant because Plaintiffs failed to prove that either Morales or Thompson relied upon it. The cases cited by Defendants in support of their claim are distinguishable from the facts of the instant case. For example, Defendants rely upon Haynes v. American Motors Corp., 691 F.2d 1268 (8th Cir.1982). The plaintiffs in that case sought admission of television commercials into evidence in support of their misrepresentation claim. Id. at 1270-71. The plaintiffs alleged that the commercials led them to believe that their vehicle, a Jeep CJ-5, would not roll over when it was subjected to driving conditions under which the accident took place. Id. The district court refused to admit the evidence on the basis that "there had been no evidence that in purchasing their Jeep [the] plaintiffs had relied on any representations made by [the] defendants," which the Eighth Circuit upheld. Id. at 1271.
 
 
 95
 Defendants also rely upon Drayton v. Jiffee Chem. Corp., 591 F.2d 352, 358 (6th Cir.1978). In that case, the plaintiffs claimed that, because, when purchasing the product, they relied upon evidence of television and newspaper advertisements which alleged the product in question to be safe, such evidence was admissible to establish an express warranty by the manufacturer. Id. at 358-59. The district court agreed with the plaintiffs and a panel of this court affirmed. Id.
 
 
 96
 However, unlike either of these cases, Plaintiffs in the instant case did not seek admittance of the WindWhip advertisement to prove a claim of misrepresentation or to prove that Defendants established an express warranty through the use of the advertisement. Rather, as found by the district court, Plaintiff's sought admission of the advertisement as probative evidence of the value of a flag on the motorbike. As such, we conclude that these cases are inapposite to the matter at hand, and do not change our holding that the trial court did not abuse its discretion admitting this evidence.[5]
 
 IV.
 
 97
 On cross appeal, Plaintiffs raise the issue of whether the district court erred in reducing the jury's verdict by the percentage of Thompson's comparative fault where the jury had made findings of breach of warranty. Plaintiffs argue that, because the jury had found Defendants liable for breach of warranty, the district court should not have reduced the jury's verdict by the percentage of Thompson's comparative fault.
 
 
 98
 Plaintiffs filed a motion to amend the judgment, asking the district court to enter a judgment which reflected the full amount of the jury verdict without reduction based upon comparative fault. The district court denied Plaintiffs' motion, finding comparative fault applicable to a product liability claim based on breach of warranty. In its decision addressing Plaintiffs' motion, the district court noted that the issue before the court was one of first impression in Kentucky. The district court framed this issue as follows:
 
 
 99
 [W]hether or not KRS 411.182 applies to products liability claims based on breach of warranty and as such, may be used to reduce a plaintiff's judgment by the plaintiff's own fault as determined by the jury; or whether awards based on breach of warranty in products liability actions are not to be reduced by a plaintiff's comparative fault, as Kentucky's version of the UCC, KRS Chapter 355, does not recognize contributory or comparative negligence as a defense.
 
 
 100
 (Op. and Order at 15; J.A. at 83.)
 
 
 101
 The district court resolved this issue based on its reading of Kentucky's Comparative Fault Statute, KY. REV. STAT. § 411.182, in conjunction with Kentucky's Product Liability Act, KY. REV. STAT. § 411.300, et seq. KY. REV. STAT. ANN. § 411.182(1) (Banks-Baldwin 1991), in pertinent part, provides:
 
 
 102
 In all tort actions, including products liability actions, involving fault of more than one party to the action ... the court, unless otherwise agreed by all parties, shall instruct the jury to answer interrogatories or, if there is no jury, shall make findings indicating:
 
 
 103
 * * * * * *
 
 
 104
 (b) The percentage of the total fault of all the parties to each claim that is allocated to each claimant [and] defendant....
 
 
 105
 For purposes of the Product Liability Act, a "product liability action" is defined as follows:
 
 
 106
 As used in KRS 411.310 to 411.340, a "product liability action" shall include any action brought for or on account of personal injury, death, or property damage caused by or resulting from the manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, testing, listing, certifying, warning, instructing, marketing, advertising, packaging or labeling of any product.
 
 
 107
 KY.REV.STAT. ANN. § 411.300(1) (Banks-Baldwin 1991).
 
 
 108
 The district court construed these provisions to mandate that comparative fault be applied to breach of warranty claims which arise in a products liability context. (Op. and Order at 16; J.A. at 84.) The district court reasoned that KY. REV. STAT. § 411.182(1) states that apportionment applies to products liability actions, and KY. REV. STAT. § 411.300(1) defines products liability actions to include warranty claims. Id.
 
 
 109
 Plaintiffs argue that the district court impermissibly extended the purview of KY. REV. STAT. § 411.300(1) and that this statute's definition of a product liability action cannot be used to determine what is meant by "products liability actions" in KY. REV. STAT. § 411.182. Plaintiffs also argue that § 411.300(1)'s definition of a product liability action does not include breach of warranty claims.
 
 
 110
 Ordinarily, we review a denial of a Rule 59(e) motion to alter or amend a judgment for abuse of discretion. See Columbia Gas Transmission, Corp. v. Limited Corp., 951 F.2d 110, 112 (6th Cir.1991); Fed.R.Civ.P. 59(e). However, "when the lower court rejects an application under Rule 59(e) based upon an erroneous legal doctrine, our standard of review is the same as in other cases of legal error." Huff v. Metropolitan Life Ins. Co., 675 F.2d 119, 123 n. 5 (6th Cir.1982). Because this is a diversity case, under the doctrine of Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), our court must apply the law of Kentucky as articulated by the Kentucky Supreme Court, or as we predict the Kentucky Supreme Court would apply the law if the case were before it. See Nature Conservancy v. Machipongo Club, Inc., 579 F.2d 873, 875 (4th Cir.1978).
 
 
 111
 This Court rejects Plaintiffs' arguments based on recent Kentucky Supreme Court case authority which strongly supports the rationale adopted by the district court in this instance. In Monsanto Co. v. Reed, 950 S.W.2d 811, 814 (Ky.1997), the Kentucky Supreme Court stated:
 
 
 112
 The PLA applies to all damage claims arising from the use of products, regardless of the legal theory advanced. There is no language in the PLA which suggests that products liability actions mean only those actions based on strict liability in tort under Section 402A of the Second Restatement of Torts. As we read the Act, if a claim is brought against a seller or a manufacturer of a product which is alleged to have caused injury, then the PLA applies, regardless of whether the action is founded on strict liability in tort, negligence or breach of warranty. While each of these theories of recovery in products liability cases requires proof of different elements and has different implications (Williams v. Fulmer, 695 S.W.2d 411 (Ky.1985)), their central purpose is the same: recovery of damages for injury or property damage caused by a product.
 
 
 113
 Hence, Monsanto Co. makes clear that § 411.300(1)'s definition of a product liability action includes claims for breach of warranty.
 
 
 114
 In addition, in Caterpillar, Inc. v. Brock, 915 S.W.2d 751, 753 (Ky.1996) (citation omitted), the Kentucky Supreme Court held that § 411.182(1) negated the products liability statute enunciated in § 411.320(1)[6]:
 
 
 115
 [T]he Kentucky legislature enacted the comparative fault statute, KRS 411.182 (effective July 15, 1988) and specifically drafted a provision to include products liability actions. The proposed apportionment statute is adverse to the purpose of the products liability statute to such an extent that the apportionment statute negates the products liability statute enunciated in KRS 411.320(1).
 
 
 116
 The language of the comparative fault statute, KRS 411.182, is straightforward and admits, with ease, to only one construction: that in all tort actions, including products liability actions, fault is to be apportioned among all parties to each claim. The chosen language of the legislature is plain and direct rather than circumferential. The date of enactment and the legislative history intone negation of KRS 411.320(1).
 
 
 117
 Accordingly, § 411.182(1) applies to the same products liability actions covered by § 411.320(1); and § 411.320(1)'s coverage is determined by § 411.300(1)'s definition of a "product liability action," which, as discussed above, includes claims for breach of warranty. Hence, § 411.182(1)'s definition of "products liability actions" appears to be coextensive with § 411.300(1)'s definition and thus includes breach of warranty actions.
 
 
 118
 Therefore, contrary to Plaintiffs' assertions, this Court believes that § 411.182(1) applies to the same products liability actions covered by § 411.300(1). Consequently, the district court correctly ruled that comparative fault under KY. REV. STAT. § 411.182 applies to products liability actions based on breach of warranty. Accordingly, we affirm the district court's denial of Plaintiffs' motion to amend judgment.
 
 V.
 
 119
 Having found no basis for reversal, we AFFIRM the final judgment of the district court and the district court's order denying Defendants' motions for judgment after trial and for a new trial as well as denying Plaintiffs' motion to amend judgment.
 
 
 120
 KENNEDY, Circuit Judge, dissenting.
 
 
 121
 Because I believe that a judgment as a matter of law should have been entered for the defendants pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, I must respectfully dissent from the majority opinion. In my view, the combination of several evidentiary errors and plaintiffs' failure to carry their burden in establishing by a preponderance of the evidence that the motorbike was defective warrants judgment in favor of the defendants or at the very least a new trial.
 
 I.
 
 122
 As noted in the majority opinion, plaintiffs alleged at trial three theories to support their claim that Honda's motorbike was defectively designed: (1) lack of a safety flag; (2) lack of a key-lock ignition; and (3) the motorbike's inappropriateness for children under twelve years of age. I agree with the majority opinion's conclusion that plaintiffs failed to establish that the lack of a key-lock ignition was a proximate cause of the accident. However, I disagree with the opinion's conclusion that the first and third theories support the jury's verdict for the plaintiffs on their claim that the motorbike was defectively designed.
 
 
 123
 a. Lack of a Safety Flag
 
 
 124
 At trial, plaintiffs contended that the motorbike was defectively designed because it lacked a safety flag. The majority concludes that, due to conflicting expert opinions, reasonable minds could differ as to whether the lack of a safety flag was a substantial factor in causing the accident. However, because I believe that the District Court abused its discretion in allowing the plaintiffs' witness to testify as an expert regarding whether the lack of a safety flag constituted a defective design, the evidence that remains warrants judgment as a matter of law for the defendants.
 
 
 125
 Plaintiffs' expert witness, William Kitzes, suggested that Honda should have attached a safety flag to the bike in the following testimony:
 
 
 126
 since the early '70's, Honda has marketed and sold a safety flag for use on children's motorized vehicles. And that flag can be as tall as eight feel tall, and it could give visibility to a small rider, especially on a small bike, to other riders and to traffic or whoever else it might be so that they're more easily spotted when they're riding the vehicle.[1]
 
 
 127
 J.A. 286. Kitzes testimony should not have been admitted. Mr. Kitzes had no special training or experience which would qualify him to testify as an expert regarding the design of the motorbike or any alternative designs for the vehicle.
 
 
 128
 Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony. Rule 702 provides as follows:
 
 
 129
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.
 
 
 130
 Fed.R.Evid. 702. A district court's admission of expert testimony under Rule 702 is reviewed for an abuse of discretion. See General Elec. Co. v. Joiner, 522 U.S. 136, ----, 118 S.Ct. 512, 515, 139 L.Ed.2d 508 (1997).[2] Whether a proposed witness is qualified to testify as an expert is determined, in part, by examining "whether the witness's 'knowledge, skill, experience, training, or education,' are such as to qualify him or her to testify as an expert at all, and it may include a determination of the tests or experiments that the proffered expert conducted, if any." Cook v. American S.S. Co., 53 F.3d 733, 738 (6th Cir.1995) (quoting Fed.R.Evid. 702).
 
 
 131
 Kitzes holds a Bachelor's Degree in history from the University of Wisconsin and a Juris Doctorate from American University. He additionally holds a certificate in safety management from the American Society of Safety Engineers. He participated in fifty hours of course work in human factors engineering at the University of Michigan and is board certified in Products Safety Management and Hazard Control Management. He was employed with the Consumer Products Safety Commission ("CPSC") for several years[3] and, at the time of trial, he owned a company called Consumer Safety Associates operated by Kitzes, his wife, and one assistant. However, Kitzes does not have a degree in engineering nor is he an accident reconstructionist. He has never ridden a Z50R, he has never participated in any testing involving children operating the Z50R, and he never observed Gary Thompson ride the Z50R. Moreover, he has never seen any testing conducted by Honda on the vehicle. During Honda's cross-examination of Kitzes, he was asked whether he had performed any tests to determine "if you attach a six-foot wind flag to this vehicle whether, when this vehicle was traveling behind a three-foot embankment with a six-foot rolled bale of hay on top of it, you'd be able to see the wind flag?" J.A. 294-95. Kitzes responded that he had not performed any such tests.
 
 
 132
 While Kitzes was qualified as an expert to testify regarding the manner in which the CPSC collects statistics on consumer product safety, which he did, Kitzes was not qualified to testify as an expert regarding the design of the motorbike at issue in this case.[4] He has no knowledge, skill, experience, training, or education regarding the design of this motorbike or the designs of other motorbikes. His testimony regarding the lack of a safety flag, therefore, went beyond his area of expertise. "When making a preliminary finding regarding an expert's qualifications under Fed.R.Evid. 104(a), the court is to examine 'not the qualifications of the witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.' " Smelser v. Norfolk Southern R.R. Co., 105 F.3d 299, 303 (6th Cir.) (quoting Berry v. City of Detroit, 25 F.3d 1342, 1351 (6th Cir.1994)), cert. denied, --- U.S. ----, 118 S.Ct. 67, 139 L.Ed.2d 29 (1997). In the case of Mr. Kitzes, his qualifications did not provide a foundation for him to answer the questions he did. Under these circumstances, the District Court abused its discretion in permitting Kitzes to testify as an expert witness.
 
 
 133
 Furthermore, even if we include Kitzes's testimony in determining whether there was sufficient evidence to conclude that the motorbike was defective for failing to include a safety flag, Kitzes did not testify as to one critical element of the plaintiffs' case: proximate cause. The burden is placed on the plaintiffs to prove that the lack of a safety flag was a substantial factor in bringing about Gary's accident. Kitzes testified only that a flag "could give visibility to a small rider, especially on a small bike, to other riders and to traffic or whoever else it might be so that they're more easily spotted when they're riding the vehicle." (emphasis added). "Could" is not the legal standard utilized to prove causation. See Calhoun v. Honda Motor Co. Ltd., 738 F.2d 126, 130 (6th Cir.1984)("where an accident could have resulted for any number or reasons, the plaintiff has failed to establish the necessary proximate cause")(emphasis added). Rather, to establish proximate cause by circumstantial evidence, " 'the evidence must be sufficient to tilt the balance from possibility to probability.' " Morales v. American Honda Motor Co., 71 F.3d 531, 537 (6th Cir.1995)(quoting Calhoun, 738 F.2d at 130). When asked whether a vehicle on the main road would see the flag had one been attached to the motorbike as it was travelling behind a three-foot embankment topped with a six-foot rolled bale of hay, the crucial question addressing proximate cause, Kitzes could not answer because he had not performed any such tests to determine the answer.
 
 
 134
 In summary, Kitzes's opinion that a safety flag could have prevented the accident was based on nothing more than conjecture and supposition and, therefore, should not have been admitted. Furthermore, even if Kitzes's testimony was properly admitted, Kitzes did not testify that the lack of a safety flag was a probable cause of this accident; consequently, plaintiffs introduced no evidence of proximate causation.
 
 
 135
 The evidence that remains once Kitzes's testimony is excluded or once it is understood that Kitzes did not render a sufficiently conclusive opinion as to the proximate cause of the accident, is the testimony of Dr. Graeme Fowler, Honda's expert. Dr. Fowler did perform tests to determine whether a safety flag would have prevented the accident. Fowler described his testing as follows:
 
 
 136
 ... I went in and actually pulled a flag from one of my lockers that I have at work. And what I'm going to do is assume that a flag is, like, six foot high. Okay? What I did then was to look at the survey to see whether or not-- if Gary Thompson had a flag on his vehicle, where would that be visible above the hay bales that lined that entrance road.[5] And don't forget that that entrance road is somewhat depressed from the grassy border on which the hay bales were stacked.
 
 
 137
 However, based on that survey and looking at the height of the vehicle and I assumed in my analysis that the ... the flag ... would be at approximately two feet high ...
 
 
 138
 ... So you got two feet plus six feet. So you've got approximately an eight-foot-high flag, eight feet above the ground. Well, looking at the survey, I found that certainly as--up on the entrance--if the[6] vehicle was traveling along that entrance road with a flag with a maximum height of about eight feet, it would be seen above the bales, and anywhere from two feet to one feet above the bales ... you could probably see a flag bobbing along the road.
 
 
 139
 One of the things that you've got to remember is these--once the vehicles start moving, these flags bend back slightly. But I'm assuming that you could still see the flag.
 
 
 140
 . . . . .
 
 
 141
 ... the motorcycle came down this road, yes, you could see the flag above the hay bales. Okay? Although it would be obscured by these two trees as the vehicle passed behind the trees.
 
 
 142
 The next thing I wanted to determine was, okay, given this vehicle had a flag, what was the last point at which Ms. Graham would have had to have seen the flag, okay, before it was too late.
 
 
 143
 At this point in his testimony, Fowler concludes that, if Graham had spotted the flag by 143 feet from the farm entrance and if Graham had taken 1.25 seconds to react and hit the brakes, she would have just missed him. Fowler termed this situation the "near-miss scenario." However, Fowler testified that in the actual accident it took Graham 1.27 seconds to hit her brakes. Furthermore, because of the angle at which the flag would be positioned (at 17 degrees to the right of the driver) and the driver's attention to the road straight ahead, Fowler concluded it would be very difficult for the driver to see a 12-inch flag in the driver's peripheral vision. Fowler additionally noted that it would have been difficult for Graham to spot the flag due to "cluttered visual background;" the flag would have been competing with trees and branches that were also in the visual area. Fowler further discussed a study which concluded that drivers look to the right-hand-side of the roadway only 10 percent of the time they are driving and that only 1 to 2 percent of the time will a driver look past 12 degrees to the right side of the roadway. Fowler then concluded that Graham would have likely been fixated straight ahead more than usual because she was approaching the crest of a hill, watching for any hazards that could be approaching from the other side. Because of all these factors, Fowler concluded that it was unlikely Graham would have detected the flag before it was too late. Fowler's testimony continues in the joint appendix as follows:
 
 
 144
 ... Suppose she does see the flag. Well, the next thing she's got to do is then figure out whether that flag is actually going to--is on a converging course and that a collision is likely to occur ... She has no information relative to what type of vehicle the operator has. All you can see is potentially a flag moving along.
 
 
 145
 . . . . .
 
 
 146
 Well, it's absolutely reasonable for her to believe that whatever is coming along that road is going to stop prior to going on the main road.
 
 
 147
 . . . . .
 
 
 148
 And, also, at 14 miles an hour, the flag is not moving that fast. So it's not at such an excessive speed that you know that a person or the thing that's associated with that flag is going to not be able to stop.
 
 
 149
 So, for all of these different reasons, I don't believe that she would have--she would have first detected the flag, perceived there was going to be a collision, decided it was necessary to actually react and hit the brakes before it was too late, before we were into the red zone.
 
 
 150
 J.A. 328-29. Based on his tests, Fowler concluded that "a flag would not have prevented this accident." J.A. 327.[7] Thus, the only expert who did perform a study of whether the driver would see a flag, with the conditions as they were when Ms. Graham hit Gary Thompson, concluded that a six-foot flag would not have been seen by Ms. Graham in sufficient time to allow her to come to a stop before colliding with Gary Thompson. Fowler's testimony was the only evidence presented regarding whether the lack of a safety flag was a proximate cause of the collision. Because Fowler testified that the lack of a safety flag could not have caused the accident, there is no evidence supporting proximate cause, an essential element of the plaintiffs' claim. As acknowledged by the majority opinion, the plaintiff has the burden of establishing causation in product liability actions and causation exists where the defendant's conduct is a substantial factor in bringing about the injured party's harm. See Morales v. American Honda Motor Co., 71 F.3d 531, 537 (6th Cir.1995). Because Fowler testified that the lack of a safety flag was not a factor in the collision and no evidence exists to contradict his testimony, a judgment against Honda based on this theory is not supported by the evidence.
 
 
 151
 b. Age Appropriateness
 
 
 152
 Plaintiffs also alleged at trial that the motorbike was defective because, while Honda recommended the motorbike for children seven and older, the bike was not appropriate for children under age twelve. Plaintiffs specifically argued that children under the age of twelve do not possess the requisite cognitive skills to safely operate a motorbike like the one purchased by Ms. Morales. Plaintiffs presented their theory of inappropriate age recommendations via two avenues: (1) Dr. Kitzes's use of accident and injury statistics produced by the Consumer Product Safety Commission; and (2) the testimony of Dr. Karen DeMoss, a psychologist who testified that children between the ages of seven and nine (Gary's age at the time of the accident) do not have sufficient cognitive skills to operate a motorbike.[8]
 
 
 153
 i. Admission of Accident Statistics
 
 
 154
 Over Honda's objection and through witness Kitzes, plaintiffs admitted a CPSC document entitled "Hazard Analysis of Mini-Bike Related Injuries," dated November, 1974, as well as other statistics. This publication indicated that, by virtue of selected hospital emergency room entries into a database called the National Electronic Injury Surveillance System, 31,000 accidents involving off-road motorbikes occurred in 1973. Fifty percent of these injuries occurred to children between the ages of 10 and 14 and fifteen percent occurred to those between ages 5 and 9. In addition, Mr. Kitzes testified regarding the statistics for other years. For example, in 1981, 34,542 injuries occurred. Of the 34,542 injuries, 15,000 occurred to children ages 5 to 14. From those statistics, however, Mr. Kitzes could not inform the jury regarding how many injuries occurred to children between the ages of 7 and 9, how many involved the specific model at issue in the instant case, or how many generally involved a Honda vehicle. Furthermore, the statistics did not identify how many accidents occurred due to a child's failure to stop before entering a public roadway. In fact, only 4 of the 10,000 to 16,000 accidents involving off-road motorbikes even occurred on public thoroughfares, according to Ms. DeMoss.
 
 
 155
 In a products liability action wherein the plaintiff alleges the product has been defectively designed, plaintiff may introduce evidence of other accidents if the other accidents occurred under substantially similar circumstances. See Brock v. Caterpillar, Inc., 94 F.3d 220, 224 (6th Cir.1996), cert. denied 520 U.S. 1166, 117 S.Ct. 1428, 137 L.Ed.2d 537 (1997); see also Montgomery Elevator Co. v. McCullough, 676 S.W.2d 776, 783 (Ky.1984). Because this is a relevancy determination, we review the District Court's decision to admit the evidence for an abuse of discretion. See Montgomery Elevator, 676 S.W.2d at 783 (citing Fed.R.Evid. 401).
 
 
 156
 I disagree with the majority's conclusion that the District Court did not abuse its discretion in admitting these statistics. In my view, the District Court plainly abused its discretion in admitting these general statistics regarding off-road motorbike accidents. The facts underlying these accident statistics are not substantially similar to those underlying the instant case. The statistics do not distinguish this model of Honda motorbike from other models and manufacturers, how each accident occurred, or how many occurred to children of Gary Thompson's age. According to Kitzes, he could not inform the jury as to how many of the injuries noted occurred to "children between the ages of 5 and 9, [and] occurred because a child didn't stop and entered a public highway with a minibike." Because these statistics played such a large role in the plaintiffs' attempt to establish the age inappropriateness theory, I cannot conclude that this error was harmless under Rule 103(a) of the Federal Rules of Evidence.[9]
 
 
 157
 I agree with the majority's conclusion that, once the statistics were admitted, Honda should have been permitted to introduce the CPSC's denial of a rule-making petition despite 15 U.S.C. § 2074(b), which prohibits the admission of evidence of the CPSC's inaction in suits relating to consumer products. However, while the majority holds that the erroneous exclusion of the denial of the rule-making petition did not affect the substantial rights of the defendants, I submit that the exclusion of this rebuttal evidence was not harmless. The plaintiffs admitted the statistics in an attempt to establish a direct correlation between the number of motorbike accidents and the youth of the children involved in the accidents. The correlation, plaintiffs contended, supported their theory that the motorbike was inappropriate for children Gary's age. The denial of the rule-making petition rebutted that theory; the denial constituted direct evidence that the age of the riders was not related to the number of accidents, in direct contradiction to plaintiffs' theory. As noted by the majority opinion, the petition submitted by two physicians requested regulation of unlicensed, two-wheeled vehicles. Specifically, the petition "requested design and labeling requirements to address the risk to children under age 14 from these off-road vehicles." J.A. 178. The Commission's denial was "based on the fact that the vast majority of injuries associated with these vehicles are related to the way they are used and not to design characteristics which the Commission could effectively or practically regulate." J.A. 178. I have little doubt that the government statistics impacted the jury's decision. To permit the introduction of the underlying statistics, but not the ultimate decision made by the government regarding those statistics, clearly constituted prejudicial error. At the very least, the error entitles defendants to a new trial.
 
 
 158
 ii. Testimony of Dr. DeMoss
 
 
 159
 To further support their age inappropriateness theory, plaintiffs offered the testimony of Dr. Karen DeMoss. In addition to testifying regarding the CPSC statistics, Dr. DeMoss, a psychologist for the Fayette County School District, testified generally regarding the psychological development of children and concluded that Honda's age recommendation of seven-years-old was not appropriate. In her opinion, a seven-year-old is "not cognitively developed to a degree, to safely operate a machine that is much more sophisticated than the child's thinking skills." J.A. 245. More specifically, Dr. DeMoss stated, "[t]hey're not at a stage cognitively where they're capable of handling a machine with this sort of skill that's required with regards to speed, depth perception, remembering rules, and operating the motorcycle at the same time; too many factors and variables that they have to take into account." J.A. 246. In her opinion, children between the ages of 7 to 9 are capable of only performing one task at a time.[10] Dr. DeMoss ultimately concluded that the motorbike at issue was unsafe for children under the age of 12 and therefore should not have been recommended for use by a child under that age.
 
 
 160
 The majority opinion relies, in part, on Dr. DeMoss's testimony in concluding that sufficient evidence was presented to permit a reasonable jury to find that Gary Thompson's inability to concentrate on the multiple tasks necessary to safely operate the motorbike was a substantial factor in causing the accident. Dr. DeMoss's testimony, however, did not establish the requisite causation element; Dr. DeMoss did not testify that Gary's age was a substantial factor in the accident.[11] Dr. DeMoss's testimony did not prove that Gary's immature cognitive skills in any way caused the accident in question. Dr. DeMoss simply never tested, evaluated or reviewed the cognitive skills of Gary Thompson. According to Dr. DeMoss, she never spoke with Ms. Morales regarding Gary's pre-accident "riding behavior," and she never observed Gary ride the motorcycle. Furthermore, while she could not specifically recall that Gary rode the motorbike without incident for three years before the accident, she understood that to be the case. Thus, Dr. DeMoss's testimony does not provide the evidence needed to establish causation between Gary's age at the time of the accident and the occurrence of the accident.
 
 
 161
 The only remaining evidence regarding the age appropriateness theory was briefly introduced through Dr. Kitzes:
 
 
 162
 Q: Do you feel that this 1988 Z50R motorcycle is defective and unreasonably dangerous for its intended users of 7,8,9, and 10 years old?
 
 
 163
 A: I do.
 
 
 164
 J.A. 285-287.[12] Kitzes, however, does not have a degree in child development or in child psychology. He has never ridden a Z50R, he has never participated in any testing involving children operating the Z50R, and he never observed Gary Thompson ride the Z50R. Kitzes was not, therefore, qualified to testify as an expert regarding the ability of children under 12 to ride this motorbike for he has no knowledge, skill, experience, training, or education regarding the ability of children to safely ride this motorbike. Therefore, his testimony concerning the safe age of children to ride the bike went beyond his area of expertise. For this reason, the District Court also abused its discretion in permitting Mr. Kitzes to testify regarding the age at which children can appropriately operate Honda's motorbike.
 
 
 165
 c. Conclusion
 
 
 166
 Because there is insufficient evidence to conclude that either of the two alleged defects enumerated above was the proximate cause of the accident, it is my opinion that the District Court erred in failing to grant a motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure. Based on the totality of the evidence presented, the jury's conclusion that Honda was liable for Gary Thompson's injuries was not supported by sufficient evidence.
 
 II.
 
 167
 Accordingly, in light of the several evidentiary errors and plaintiffs' failure to carry their burden in establishing by a preponderance of the evidence that the motorbike was defective and that the defective design was a proximate cause of Gary Thompson's injuries, I would reverse the order of the District Court denying defendants' motion for judgment as a matter of law.
 
 
 
 *
 Judge Kennedy would grant rehearing for the reasons stated in her dissent
 
 
 [1]
 At the outset, we note that the joint appendix submitted in this case is somewhat inadequate. The filing of a joint appendix substantially out of compliance with the requirements of the rule may result in dismissal of the appeal. 6th CIR. R. 11(l); see Brindley v. McCullen, 61 F.3d 507, 508 n. 1 (6th Cir.1995) (emphasizing the importance of including those portions for the trial testimony that explain the district court's holding in the joint appendix). Although we find the joint appendix to be lacking in several areas, we are not inclined to dismiss the appeal. Therefore, we will review the issues presented based upon the portions of the record provided in the appendix
 
 
 [2]
 Because we find that the district court abused its discretion in excluding evidence of the report on this basis, we need not address Defendants' argument that the evidence should have been admitted on the basis that Plaintiffs "opened the door" to such evidence
 
 
 [3]
 Fed.R.Civ.P. 61 provides:
 No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.
 
 
 [4]
 See, e.g., Smelser v. Norfolk S. Ry., 105 F.3d 299, 302 (6th Cir.1997); CMI-Trading, Inc. v. Quantum Air, Inc., 98 F.3d 887, 890 (6th Cir.1996); United States v. Thomas, 74 F.3d 676, 681-82 (6th Cir.1996)
 
 
 [5]
 We note that Defendants cite to two state court decisions in support of their claim which we find equally as inapposite as the federal circuit court cases
 
 
 [6]
 KY.REV.STAT. ANN. § 411.320(1) (Banks-Baldwin 1991) states, in pertinent part, the following: "In any product liability action, a manufacturer shall be liable only for the personal injury, death or property damage that would have occurred if the product had been used in its original, unaltered and unmodified condition...."
 
 
 [1]
 Kitzes added, however, that no Kentucky standard or regulation required an off-road motorbike to have a wind flag
 
 
 [2]
 Due to the Supreme Court's clarification of the standard of review in Joiner, I do not believe the majority's opinion needs to struggle with the question of the proper standard of review to apply and whether Cook v. American Steamship Co., 53 F.3d 733 (6th Cir.1995), conflicts with other decisions of our Circuit
 
 
 [3]
 The testimony in the joint appendix does not indicate how many years Kitzes worked for the CPSC
 
 
 [4]
 Furthermore, given his experience with the CPSC, Kitzes was likely qualified to testify regarding necessary or appropriate warnings for the motorbike. Notably, however, the jury found that Honda's warnings were adequate
 
 
 [5]
 Trooper Ronald Wardrip testified that the hay bales were between 5 1/2 and 6 1/2 feet tall and that they sat on a 3 to 3 1/2 foot embankment
 
 
 [6]
 His testimony in the joint appendix ends here and picks up again twelve pages later. The next few paragraphs are from the record transcript. While the majority opinion properly emphasizes that it is the responsibility of both parties to submit a complete joint appendix to the court, we need not limit our review to the joint appendix as the majority indicated it has
 
 
 [7]
 Supporting Fowler's testimony and description of the scene, Trooper Ronald Wardrip testified that the embankment, the bales of hay, a fence, a telephone pool and a large tree obstructed Ms. Graham's view. Wardrip concluded that the combination of the obstructed view, Gary's failure to yield the right-of-way, and his inattention caused the accident
 
 
 [8]
 Dr. DeMoss utilized the CPSC statistics as well
 
 
 [9]
 Rule 103(a) provides, "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." Fed.R.Evid. 103(a)
 
 
 [10]
 Therefore, Dr. DeMoss testified that children of this age do not have the requisite cognitive skills to even ride a bicycle because that activity requires the ability to concentrate on and process several tasks at once
 
 
 [11]
 I am of the further opinion that, while Dr. DeMoss was generally qualified to testify regarding the cognitive skills of children, she was not qualified to testify regarding the cognitive skills required to ride a motorbike. In order to determine whether Dr. DeMoss was qualified to testify regarding the cognitive skills required to ride a motor bike, we examine her knowledge, skill, experience, and training. Dr. DeMoss testified on cross-examination that none of her published papers had anything to do with "child skill development and the operation of motor vehicles" or even "skill development in the use of any type of recreational vehicle." J.A. 255. Furthermore, Dr. DeMoss did not "physically observe young children operating the Z50R." J.A. 256. Given this testimony, it is my opinion that the District Court abused its discretion in determining that Dr. DeMoss was qualified to give expert testimony on the cognitive skills required to operate a motorbike. However, defendants have not argued to this Court that Dr. DeMoss's testimony should not have been permitted
 
 
 [12]
 Just prior to this portion of his testimony, Mr. Kitzes opined that age 12 was the absolute minimum appropriate age for a child to ride the motorbike. J.A. 285