**Melvin KNOTTS, etc., et al., Plaintiff,**

v.

**BLACK & DECKER, INC., et al., Defendant.**

**Case No. 3:00 CV 7734.**

United States District Court, N.D. Ohio, Western Division.

May 13, 2002.

Barry W. Fissel, Eastman & Smith, Toledo, OH, Stuart J. Goldberg, Eastman & Smith, Toledo, OH, Timothy L. Mullin, Miles & Stockbridge, Baltimore, MD, for Black & Decker, USA, Inc.

Stuart J. Goldberg, Eastman & Smith, Toledo, OH, for Meijer, Inc.

Warren S. George, Uhlinger & Keis, Cleveland, OH, Alan L. Mollenkamp, Mollenkamp & Fisher, Toledo, OH, for Lisa Kay Amerson, Melvin Knotts.

## MEMORANDUM OPINION

KATZ, District Judge.

This matter is before the Court on Defendant's Motion for Summary Judgment and multiple Motions in Limine. The parties have fully briefed the issue rendering these matters ripe for disposition. This Court has jurisdiction under 28 U.S.C. § 1332.

### BACKGROUND

This action arises out of a fire which occurred at 528 Buckeye Street in Toledo, Ohio on November 14, 1998. Residents of the home included Mrs. Ladean Knotts, age 60 [1], as well as her son Martin and his wife who lived in the upstairs portion of

---

1. At the time of the incident, Mrs. Knotts was confined to bed for health related reasons.

the home. A second son, Melvin, lived nearby with his children, Michael, age 3, and Harley, age 1. Ladean's daughter, Lisa Amerson, also lived nearby with her children Milisa Knotts, age 14, Samuel Amerson, age 5, Nathaniel Amerson, age 3, and Chelsea Amerson, age 14 months. Mr. Larry Pringle, Ladean's significant other, was presently living with Lisa Amerson during renovations[2] to the 528 Buckeye Street address. During a regular day, Lisa and Melvin brought their children to Mrs. Knotts' home while they worked and Milisa Amerson[3] babysat.

The front of the Buckeye Street residence faced south and the house had a front porch with a front entrance. On entering the home, there was a small alcove. To the left of the alcove there was a stairway leading to the second story where Mrs. Knotts' son Martin lived. To the right of the alcove was a doorway leading to the living room which was functioning as Mrs. Knotts' bedroom. Behind or to the north of the living room/bedroom was a dining room which was under renovation. Melvin Knotts and Mr. Pringle had installed new wiring, breaker boxes and outlets several weeks before the fire. According to Melvin Knotts, the local utility company had approved and inspected all new wiring for the renovation before the power was activated. At the time of the fire, drywall had been installed on the north and east walls of the dining room and there was drywall leaning in the northeast corner of the dining room while plywood was leaning against the east wall.

On the south wall of the dining room, a space heater was plugged into an electrical outlet. That space heater was hooked up to a gas tank located in the basement. On the day of the fire, Melvin Knotts observed that the space heater in the kitchen was not turned on, but Milisa Amerson testified that the heater was on. A second space heater was located near the north wall of the living room/bedroom and, according to Martin Knotts, it was activated.

Just shortly before the fire, Melvin Knotts purchased two Black & Decker Versapak battery chargers at a Meijer Store. The battery charger consisted of (1) a transformer which was plugged into an electrical outlet and (2) a charger base capable of charging two batteries at one time. According to Melvin Knotts, the charger base had an opening on the back of its plastic housing which allowed it to be hung from a nail on a wall. At the time of the fire, the battery charger was plugged into the top outlet of a duplex receptacle on the northeast wall of the dining room. The outlet was approximately one foot above the floor. The lower outlet was covered by a childproof plastic cap. The battery charger hung from a nail approximately five and a half feet above the floor. The transformer and the receptacle into which it was plugged were obscured by the drywall leaning against the wall; however, Melvin Knotts stated that the drywall was not leaning on the power cord of the battery charger.

On the morning of November 14, 1998, Martin Knotts rose before 5:00 a.m. to prepare to go to work. Before leaving the house, he walked through the downstairs living room/bedroom and into the dining room to make coffee. After chatting with his mother, Martin unplugged a utility light which was plugged into an outlet in the dining room located behind the space heater. Mrs. Knotts had complained that the light, which was hanging from the rafters in the dining room, was bothering

---

**2.** Upon completion of the renovations to the Buckeye Street home, Mr. Pringle and John Knotts would move in to live with Ladean, Melvin Knotts and his wife.

**3.** Although Milisa was of school age, she was being home-schooled by her mother.

her. Martin also testified that he may have unplugged the dining room space heater and turned off its gas valve (located on the floor), but he is unsure.

At approximately 5:30 a.m. Melvin Knotts came by the home to drop off insulation and picked up a set of batteries located in the battery charger. Melvin then placed another set of batteries into the charger. He left the home about thirty minutes later.

Lisa Amerson arrived around 8:15 a.m. with her and Melvin's children. Fourteen year old Milisa Amerson was to babysit Samuel, Nathaniel, Chelsea, Michael and Harley. According to Milisa, the children stayed in the living room of the Knotts home and were not permitted in the dining or any back rooms due to the ongoing renovations.

At around 10:00 a.m., Milisa's friend, Kristy Williams, arrived with her baby to visit. Shortly thereafter, both girls heard a buzzing noise but could not determine its source or origin. Milisa then fed the children lunch and thereafter, she, Kristy and Kristy's baby went outside to take out the garbage. When Milisa went outside, Nathaniel was napping on the bed with Mrs. Knotts.

Minutes after Milisa was outside, Samuel ran outside to alert Milisa as to the fire. Milisa went into the house and saw a wall on fire. She then attempted to get all of the children out of the home and then went back to rescue her grandmother. During that rescue attempt, one year old Harley wandered back into the house and up the stairs. Milisa was unable to get her grandmother out of the house and two

neighbors actually dragged Milisa to safety just prior to firefighters arriving on the scene. Both Harley and Mrs. Knotts died in the fire.

A subsequent investigation was conducted by the Toledo Fire Department. The origin of the fire was determined to have been located at the east wall of the dining room. The investigation initially ruled the cause of fire as undetermined. However, after interviewing family members, including two of the children, a supplemental report found the fire "was accidental and all indications point[ed] to a[sic] electrical battery charger used for charging cordless tools."

Plaintiffs Melvin Knotts and Lisa Amerson as administrators of the decedents' estates initiated this action against Black & Decker asserting wrongful death and product liability claims. Black & Decker effected a timely removal from state court to the present venue and now seeks summary judgment on the basis that the Defendant's battery charger was not defective and there is no evidence that the battery charger caused the fire. Contemporaneous with its motion for summary judgment, the Defendant moves to preclude the statements of Samuel and Nathaniel Amerson as well as the testimony of the Plaintiffs' experts. As the motions in limine are central to dispositive motion pending, the Court addresses those issues first.

## MOTION IN LIMINE[4] REGARDING STATEMENTS OF CHILDREN

In anticipation of the issues which would be presented, on March 2,

---

4. Motions in limine are generally used to ensure evenhanded and expeditious management of trials by eliminating evidence that is clearly inadmissible for any purpose. *See Jonasson v. Lutheran Child and Family Serv.*, 115 F.3d 436, 440 (7th Cir.1997). The court has the power to exclude evidence in limine

only when evidence is clearly inadmissible on all potential grounds. *Cf. Luce v. United States*, 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 463 n. 4, 83 L.Ed.2d 443 (1984) (federal district courts have authority to make in limine rulings pursuant to their authority to manage trials). Unless evidence meets this high stan-

2001, the Court conducted a voir dire of each minor child in the presence of counsel. Following the individual interviews by the Court, counsel were requested to brief the issue of admissibility of the proffered statements. Thereafter, the depositions of each child took place on April 3, 2001, with the undersigned judicial officer present. At issue is the competency of Samuel and Nathaniel Amerson as well as the admissibility of their statements to fire inspectors.

## A. Competency to Testify

 Under Fed.R.Evid. 601, a court is directed to the applicable state law to determine the competency of a witness. In Ohio the trial judge is vested with the duty to conduct a voir dire of the child to determine competency. *State v. Wilson,* 156 Ohio St. 525, 532, 103 N.E.2d 552, 556 (1952). The purpose of such an examination is to allow the judge to observe firsthand the child's demeanor, his way of responding to questions, to determine the child's ability to convey facts with accuracy and truthfulness. Considerations which a trial court takes into account include:

> (1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful.

*State v. Frazier,* 61 Ohio St.3d 247, 251, 574 N.E.2d 483, 487 (1991).

At the time of the voir dire by the Court, Samuel was seven years old and Nathaniel six years of age. Upon questioning each separately, both Samuel and Nathaniel were responsive to short-term memory questions such as where they attended school, who their teachers were and their respective ages. Additionally, both children were able to identify their family members who had accompanied them to the courthouse. Both children were also able to discern the difference between the truth and a falsity. Their demeanor also indicated that they appreciated the need to be truthful in response to questions.

 Having attended the depositions of the children taken just a month after the voir dire, this Court concludes that Samuel and Nathaniel, at the time of their examination on voir dire and on deposition, were capable of receiving just impressions of facts observed and could accurately relate them to recent events. More problematic, in this Court's view, is the depth of the children's memory relative to this incident. The Court observed the children's demeanor during the depositions and it appeared that their response to counsel's questions were not contrived and appeared to be based upon their best recollection. However, the inability of the children to accurately recount the events they experienced at ages three and five, respectively,

dard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context. (citations omitted). Denial of a motion in limine does not necessarily mean that all evidence contemplated by the motion will be admitted at trial. Denial merely means that without the context of trial, the court is unable to determine whether the evidence in question should be excluded. The court will entertain objections on individ-

ual proffers as they arise at trial, even though the proffer falls within the scope of a denied motion in limine. *See United States v. Connelly,* 874 F.2d 412, 416 (7th Cir.1989) (citing *Luce,* 469 U.S. at 41, 105 S.Ct. at 463) ("Indeed, even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling."). *Hawthorne Partners v. AT & T Technologies, Inc.,* 831 F.Supp. 1398, 1400–1401 (N.D.Ill.1993).

raises serious concerns as to their competency. At times during their depositions they were unable to remember details previously given to the fire investigators and gave inconsistent answers. It is this inability to recount those impressions and details which renders them incompetent to testify as to those events. Although this is admittedly a close issue, the Court finds that the relevant factors weigh against a finding of competency; therefore, Samuel and Nathaniel Amerson are not deemed competent to testify as to the events of November 14, 1998.

*B. Admissibility of Out of Court Statements*

■ Next, the Court considers the admissibility of statements made days after the incident to Fire Investigator Sbrocchi which were included in his report of November 18, 1999. The Plaintiffs argue that these statements, even if the children are deemed incompetent to testify, should be admitted as they fall within two exceptions to the hearsay rule, namely, an excited utterance and as part of a public records report. For the reasons that follow, this Court finds these statements inadmissible.

■ Under Fed.R.Evid. 803(2), an excited utterance reflects "[a] statement relating to a startling event or condition while the declarant was under the stress of excitement, caused by the event or condition." The Ohio Supreme Court has applied a four part test to determine what constitutes a spontaneous exclamation:

(a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective,

(b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination continued to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs,

(c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and

(d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration. *State v. Wallace,* 37 Ohio St.3d 87, 89, 524 N.E.2d 466, 469 (1988). As noted by the Court in *Wallace,* the lapse of time between the event and the statement does not preclude admissibility. *Id.* In that case the declarant was unconscious for a fifteen hour period between the time she was assaulted and her unelicited statement, which in the Supreme Court's view indicated that the effect of the assault continued to dominate her thought process. Moreover, an out of court statement is not prohibited when it is the result of questioning that: "(1) is neither coercive nor leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the domination of the nervous excitement over the declarant's reflective faculties." *Id.* at 93, 524 N.E.2d at 472.

In the present action, both sides correctly identify the pivotal issue as whether at the time of the questioning the children were still under the influence of the startling event. The interview by Investigator Sbrocchi took place four days after the fire. Present during the interview in addition to Sbrocchi were Investigator Darrell

Bonnough, Samuel Amerson, Nathaniel Amerson, Milisa Knotts, and their mother Lisa Amerson. Although Plaintiffs advocate that Samuel and Nathaniel were still under the influence of the startling event, there is nothing in the record to support that contention. The deposition testimony of Investigator Sbrocchi does not indicate, for example, that the boys were visibly distraught when asked about the incident, which could have indicated that they were still under the stress of the event. It is not even clear exactly what questions were posed to Samuel and Nathaniel. Thus, on the record before the Court are the childrens' statements in response to some sort of questioning by the investigator. Taking into account that situation, coupled with the passage of four days and the unknown influences of intervening circumstances which effects on the reflective thought process are unknown, it is unclear that the young boys were still under the stress of nervous excitement. It is a combination of all these factors which leads this Court to conclude that the statements made by Samuel and Nathaniel Amerson to Investigator Sbrocchi do not qualify as excited utterances under Fed.R.Evid. 803(2).

▮▮▮▮▮▮ Alternatively, the Plaintiffs argue that the statements are admissible under the public records exception under Fed.R.Evid. 803(8). However, both the Sixth Circuit and Ohio courts have held that witness statements contained in an investigative report are not admissible under 803(8). *Miller v. Field,* 35 F.3d 1088, 1091 (6th Cir.1994); *Nelson v. Ford Motor Co.,* 145 Ohio App.3d 58, 68, 761 N.E.2d 1099, 1107 (2001). Under this rule, such factual findings of an investigation are excluded where "the sources of information or other circumstances indicate lack of trustworthiness." In light of the childrens' statements not being qualified as excited utterances, the Defendant has met its burden of establishing a lack of trust-

worthiness. *See United States v. Garland,* 991 F.2d 328, 335–336 (6th Cir.1993).

Accordingly, the statements of Samuel and Nathaniel Amerson made to the investigators four days after the incident are inadmissible.

### MOTION IN LIMINE REGARDING PLAINTIFFS' EXPERTS

*A. Expert Testimony Considerations*

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court directed the trial courts to act as gatekeepers in excluding unreliable expert testimony. Under this gatekeeping function, the trial courts were charged with assessing the reliability and relevancy of expert testimony before admissibility. Six years later, the Supreme Court expanded its application in *Daubert* to all expert testimony not just testimony which was grounded in science. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). As a result of these directives, Fed.R.Evid. 702 was amended as follows:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Although the Court in *Daubert* identified several factors, they also noted that the inquiry was flexible, setting forth a non-exclusive checklist including:

**1038**

(1)whether a theory or technique can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.

FED.R.EVID. 702 advisory committee note, 2000 Amendments.

 Regarding the reliability factor, a trial court "must focus on the soundness of the expert's methodology." *Smelser v. Norfolk Southern Ry. Co.,* 105 F.3d 299, 303 (6th Cir.), *cert. denied,* 522 U.S. 817, 118 S.Ct. 67, 139 L.Ed.2d 29 (1997). "An expert opinion that is based on scientifically valid principles will satisfy Fed. R.Evid. 702; an expert's subjective belief or unsupported speculation will not." *Id.,* citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* (on Remand), 43 F.3d 1311, 1319 (9th Cir.) *cert. denied,* 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995). Finally, the party offering the expert testimony bears the burden of proof in establishing its admissibility. *Daubert,* 509 U.S. at 592 n. 10, 113 S.Ct. at 2796.

With these principles in mind, the Court now turns to the parties' contentions.

### B. Ralph Dolence

Ralph Dolence ("Dolence") is Plaintiffs' expert on the issue of fire origin and cause. He is a licensed electrician and veteran firefighter. He has opined "that the origin and cause of the fire was an unidentified failure in the Black and Decker Versa Pack Battery Charger." (Dolence Aff.) He is not offered for the purpose of the alleged defectiveness of the product. Due to the destruction of the home and the lack of physical evidence in this case, Dolence based his opinion on review of photographs, x-ray analysis of an exemplar battery charger, analysis of the components of an exemplar battery charger, the Toledo Fire Inspection Reports and Supplemental Reports, and witness testimony.

 The Plaintiffs submit that Dolence's testimony will assist the jury in understanding how an origin of a fire is determined and will provide a forensic analysis to establish this fire's origin. In his report of October 1, 2001 [5], Dolence based his conclusion on a number of facts, all of which were gleaned from the investigative report. A review of Dolence's deposition also reveals that he did no independent investigation save for an x-ray analysis of an exemplar and taking it apart to see its components. (Dolence Dep., pp. 117, 121–122.) He did not, for example, conduct a burn test as Plaintiffs' other expert was charged with determining the product's failure. Although a fire origin expert, Dolence was unable to utilize the

---

5. We base our conclusion on a number of facts. The Black & Decker battery charger was plugged in and in operation at the point of fire origin. The battery charger was witnessed on fire. The City of Toledo Electrical Inspector examined the duplex receptacle and wiring remains of the battery charger was plugged into at the time of the fire and ruled out electrical failure or malfunction. This, in turn, rules out the duplex receptacle and associated wiring as a cause of the fire, leaving

the Black & Decker battery charger as the heat source that ignited combustibles and caused the resultant fire.

Based on the facts, statements, reports and photographs, other accidental causes have been considered and have been ruled out. The cause of the fire was an unidentified failure within the Black & Decker battery charger. (Dolence Report at p. 2.)

photographs taken at the scene as a basis for his conclusions due to the alleged poor quality of those photographs. This excerpt from his deposition reveals to a large extent the basis for his conclusions:

Q: There's nothing that you've seen that rules out—and I want you to let me start over again. Obviously, ' you've relied heavily on the witness statements in formulating your conclusions?

A: That's correct.

Q: Putting those witness statements aside for the moment, there's nothing that you have seen that rules out other potential causes of fire, is that correct?

A: That's not correct.

Q: All right. Let me try and ask another question. There are no—there's no evidence of burn pattern that are inconsistent with something else starting this fire, correct?

A: That are inconsistent?

Q: Correct.

A: Well, its not just burn pattern. It's the nature of the fire, what's inconsistent with those. The careless smoking fire is a long slow smoldering fire. You don't have—

Q: Let me try—let me try a different question. Because I know exactly where you're coming from and think I—you're going to agree with me in the end. Well, let me ask this. There is nothing that you have evaluated in terms of photographic evidence or burn pattern evidence or smoke pattern evidence that is inconsistent with these children starting the fire, correct?

A: No. I think it still has to come back to—and the only way I can answer this is to come back to what they initially saw.

Q: Okay. But other than what they saw you don't really have anything else to tell you what did start this fire, correct?

A: And a lot of things that said—tell me what did not set the—start the fire.

(Id. at pp. 101–102.) Ultimately, Dolence conceded that the pictures were not useful in determining the fire's point of origin. (Id. at p. 104.)

At other times during his deposition, Dolence conceded that he ruled out electrical failures or malfunctions based upon the conclusions of the City of Toledo's Electrical Inspector. (Id. at p. 132.) Dolence also acknowledged that if the witness statements were removed he could not opine upon the origin of the fire. (Id. at p. 141.) Dolence relied upon the fire investigators' report as supporting his opinion that the battery charger was the source of origin, yet he disagreed that the point of origin was on the east wall, as determined by the fire investigators, and opined it was on the north wall, where the battery charger was located. (Id. at pp. 147–149.)

On the issue of juvenile firesetting, he ruled out this possibility because, despite the fact that the fire investigators may not have considered this issue, there was nothing to indicate to Dolence that juvenile firesetting played a role in this incident. (Id. at pp. 97–98.) According to Investigator Sbrocchi's deposition, if it had been determined that the children had set the fire while playing, it would still have been classified as an accidental fire. (Sbrocchi Dep., p. 34.) However, the report did not indicate that the children had placed paper on the fire because he "felt the family had already had enough." (Id. at p. 54.)

A similar situation was presented in *Michigan Millers Mutual Insurance Corp. v. Benfield,* 140 F.3d 915 (11th Cir.1998), where an expert's testimony was disal-

lowed on the issue of the fire's origin. There, the expert opined that the cause of the fire was intentional as all accidental causes were eliminated and he could not identify the ignition source. *Id.* at p. 921. The expert was also unable to explain his methodology for eliminating a potential source of origin and the district court determined that his opinion on the incendiary cause was without a rational explanation and insufficient to assist the jury. *Id.*

Having carefully viewed the factors upon which Dolence premises his opinion, the Court finds that his opinion is not grounded on anything other than the fire investigation report and the witness statements contained therein. There is no independent basis or analysis grounded either in scientific methodology or reliable procedures to support his theory as to the origin of the fire. Moreover, this Court is mindful of the Supreme Court's cautionary language in *General Electric Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997) which states that:

> [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion offered.

In this instance, it is the view of this Court that Dolence's opinion is incapable of bridging the analytical gap sufficient to establish an admissible opinion on the origin of the fire. Accordingly, Defendant's Motion in Limine regarding Ralph Dolence is well taken.

### C. George Kramerich, Ph.D.

Dr. Kramerich's ("Kramerich") opinion is being offered on the functional capacity of the Defendant's product to overheat and potentially cause a fire due to a lack of thermal protection in its design. (Pltf's Opp. at p. 9.) The Defendant challenges

Dr. Kramerich's opinions as being inadmissible as they fail to comport with *Daubert's* requirements of reliability and assistance to the jury. *See also* Fed.R.Evid. 702.

The Court has carefully reviewed Dr. Kramerich's deposition testimony of November 13, 2001, his subsequent affidavit of March 24, 2002, as well as multiple exhibits submitted by Plaintiffs in support of their opposition. After review of the memoranda submitted and review of the relevant case law, the Court concludes that Dr. Kramerich's testimony fails to meet the requirements under *Daubert* and is also inadmissible.

### 1. Items Relied Upon by Dr. Kramerich

In coming to his conclusions, Dr. Kramerich reviewed documents from the Consumer Product Safety Commission ("CPSC") involving reports relative to battery chargers, an exemplar, the fire origin, witness observations and elimination of other potential heat sources. It is the Defendant's contention that the CPSC documents are inadmissible on the basis that they have not been authenticated and that they contain hearsay.

■■■■ Although the Defendants are correct that the documents have not been formally authenticated, there is a letter dated November 5, 2001, from the CPSC to Plaintiff's counsel responding to a request for information relative to selected battery chargers and drills which references "four Epidemiologic Investigation Reports with the underlying and supporting documentation." (Kramerich Dep., Ex.S, p.1.) While the formal requirements of Fed. R. Evid. 901(b) have not been technically complied with, it is clear that if allowed to proceed to trial, Plaintiffs would be able to authenticate these CSPC reports in compliance with Fed.R.Evid. 901.

Assuming for the moment that the documents are authenticated, the inquiry turns to whether these documents would be admissible at trial or fall within any exception to the hearsay rule. The November 5, 2001 letter from the CPSC offers the following insight upon the proffered documents:

> While conducting the interviews for the investigation reports, Commission staff or contractors *have spoken with the individuals involved or with others who witnessed or are familiar with the incidents.* Where possible, Commission staff examined the products reportedly involved in the incidents. Although the Commission has investigated the incidents described in the investigation reports, the Commission has not necessarily determined the cause of the incidents.

*Id.* (Emphasis added.)

The admissibility of CPSC reports has been addressed by both this Circuit and others. In *Morales v. American Honda Motor Co., Inc.,* 151 F.3d 500 (6th Cir. 1998), for example, the district court admitted a CPSC publication entitled "Hazard Analysis of Mini–Bike Related Injuries." Plaintiff's expert relied upon this information in "determin[ing] the basic cognitive skills required to operate a basic minibike or motorcycle in order to assess at what age children could safely operate such a vehicle." *Id.* at 512. As this evidence was used to establish the age appropriateness of such vehicles, its admission for that narrow purpose was deemed appropriate.

The Court in *Shelton v. Consumer Products Safety Com'n,* 277 F.3d 998 (8th Cir. 2002), affirmed the admission of laboratory test reports generated by the CPSC under the business records exception to the hearsay rule. There was no challenge by the opposing party as to trustworthiness of the information. Thus, where those reports were created in the course of regularly conducted activity, they complied with the dictates of Fed.R.Evid. 803(6) and were properly admitted.

In this instance, the CSPS documents are offered as factual reports to support Dr. Kramerich's opinion as to the functional capability of the product to cause a fire. The problem with these reports is that unlike the above examples, these documents are not merely statistics but contain witness or eyewitness statements by someone not an employee of the CPSC as to an incident and do reflect CPSC conducted experiments. As noted by the appellate Court in *McKinnon v. Skil Corp.:*

> The CPSC reports are untrustworthy because they contain double hearsay in many instances, the CPSC investigator at one level, and the accident victim interviewee at yet another level removed. Most of the data contained in the reports is simply a paraphrasing of versions of accidents given by the victims themselves who surely cannot be regarded as disinterested observers.

638 F.2d 270, 278 (1st Cir.1981).

Similar to the statements made by the young Amerson children above, these observations recorded by the CPSC are not admissible for the truth of the matter asserted. Therefore, to the extent that Dr. Kramerich relies upon these witness observations, the Defendant correctly observes that the trustworthiness of these statements/observations relative to product at issue has not been established and they are deemed inadmissible. *See, Miller v. Field,* 35 F.3d 1088, 1091 (6th Cir.1994); *Nelson v. Ford Motor Co.,* 145 Ohio App.3d 58, 68, 761 N.E.2d 1099, 1107 (2001).

*2. Kramerich's Testimony*

█ As noted by the Defendant, during his deposition Dr. Kramerich conceded that he did not rely upon all of the CSPS

documents as many of them did not contain incidents related to this case. Rather he relied upon those reports involving "a portable battery type device *that in all probability* used the same type of technology for recharging the battery that we were talking about in this case." (Kramerich Dep., p. 26.) (Emphasis added.)

Other documents which Dr. Kramerich relied upon were articles from various publications such as the following:

Q: Okay. I've next marked as Defendants' Exhibit M Page 5 from a document consisting of one page, Page 5 from the Fall 2001 issue of Fire Findings, and that contains an article which I assume you're including because it says, "Scorched charger leads to testing," correct?

A: Correct.

Q: What is it about that particular document that led to its inclusion in your file?

A: It's just an issue involving battery chargers.

Q: Do you know whether—other than the information contained in this article, do you know anything about the similarity or dissimilarity of this battery charger to the one that we're talking about here?

A: Other than my opinion that they're probably made from similar materials and use essentially the same technology, *they're totally different devices.* This was for rechargeable AA batteries. And the purpose of this test was to see if putting in regular alkaline batteries that were not rechargeable batteries would set this thing on fire. And they ran a test and it didn't set it on fire.

Q: Okay. And, in fact, they did not reach a conclusion in that article that it was probable that it could catch on fire, correct?

A: For this particular type of device, yes.

(Kramerich Dep., p. 45–46.) (Emphasis added.) Dr. Kramerich also relied upon an April 2001 Fire & Arson Investigator article despite the fact that the size of batteries at issue was different in the devices. (Id. at p. 43.)

Dr. Kramerich also hinged his opinion of the Black & Decker VP130 being susceptible to catching fire based upon other similar items:

Q: So is it accurate to say that you can't tell to a reasonable degree of engineering probability in this particular case with this particular charger that any of these failure modes that you posited would lead to ignition of that battery charger?

Mr. George: Objection

A: I have difficulty answering that question. It's my opinion, absent the scientific method evidence, that there is supporting factual documentation that this technology produces fires. And there's no reason to exclude Black & Decker's products from that body of evidence that says these kind of things do catch on fire.

Q: All right.

A: Do I have specific information that this thing made by Black & Decker caused a fire, no.

Q: That's what I'm really trying to hone in on. I understand—I think I do understand how the evidence you've looked at and how you've interpreted it. And I also understand that you simply do not have enough data about this case and about some of these other incidents to say to a reasonable degree of engineering probability that any of the failure modes that you posited in this particular battery charger can cause an ignition; isn't that right?

A: That's correct, but I need to extrapolate on that a little bit.

Q: Okay.

A: The failure modes I have hypothesized in this case are the same failure modes that would be required to occur in the battery chargers that have been reported to have caught fire and started fires.

If you take the battery chargers where we have evidence of recalls and firesetting being the result of failure and overheating in the battery charger, those battery chargers have the same type of NiCad batteries not made by Black & Decker, they use the same type of—they use the same concept of rectification using LEDs and diodes and resistors, and those failures I've hypothesized here have caused fires in those other devices, which leads me to conclude that they should cause fire in these devices.

Q: I understand that, I understand the methodology, but I guess in order for you to form an opinion to a reasonable degree of probability, you would have to do some testing, correct?

A: I would have to take the one that Dolence has, which there's testimony is a clone, and ignite it.

(Id. at pp. 115–117.)

Dr. Kramerich's opinion focused on a failure mode which would cause overheating of the battery of the charger case itself. When queried, Dr. Kramerich agreed that different color plastics might have different levels of ignition, but when asked about comparison to the product at issue, he stated: "It would be my opinion it would be highly unlikely that the materials would be significantly different in thermal characteristics, but, again, I haven't investigated it, so I don't know." (Id. at p. 45.)

Dr. Kramerich was also unable to indicate the temperature necessary to cause overheating of the battery sufficient to ignite the charger relative to the Defendant's product: .

Q: If you apply that full voltage to that battery with the failure of [diode] D3, how hot does—what gets hot?

A: The battery.

Q: How hot does it get?

A: I don't know.

Q: So you can't say to a reasonable degree of engineering probability that a failure of component D3 would get the battery in the battery charger hot enough to ignite the components of the charger base, correct?

A: It's my opinion that it does with the specifics of the NiCad in that battery and with the actual current flow. I haven't conducted any tests, so I can't tell you.

Q: You could do that, right?

A: Yeah.

(Id. at pp. 95–96.) Nor was the witness able to testify as to the temperature necessary to ignite the plastic charger case:

Q: We've already—you've already said that you don't know what the plastic charger base is made of, correct?

A: Correct

Q: And I thought we agreed early on in the deposition that in order to figure out whether something can ignite, you need to know how hot something gets and how hot whatever its going to ignite needs to be in order to catch fire, correct?

A: Un-huh.

Q: You don't know how hot this battery gets if there's this failure, correct?

A: You're taking me to the same scenario that I went through in order not to do this test. I have a general understanding of—without the spe-

cific details of quantitative information with regards to plastic and plastic burning. I've investigated enough fires involving plastic things that I know they burn. And I know there's no remarkable difference between what Black & Decker puts in its stuff or Bell & Howell or Sears or Craftsman or anybody else, nobody has a unique plastic that's non-combustible, that's been on television half a dozen times on 20/20, showing all these plastic things burn, so I know they burn. I don't need the specific quantitative thermal capacity in degrees Fahrenheit or Centigrade, it's going to burn. And we have factual evidence that these things made from this stuff does burn.

Q: Okay. I just want to make sure I understand this. You don't have any factual evidence that a Black & Decker battery charger base has overheated and ignited, correct?

A: No.

Q: Your factual evidence relates to other manufacturers, correct?

A: Yes.

Q: And you don't know how hot the batteries get in the event—the Black & Decker batteries get on a VP130 if we fail component [diode] D3, correct?

A: At this time, that's correct.

(Id. at pp. 96–98.)

On the issue of the failure rate, considering "the whole universe of similar battery chargers" Dr. Kramerich agreed that "chance of a failure of any type leading to ignition" was "low" or "remote" but did not want to "extrapolate [ ] beyond that." (Id. at pp. 110–111.)

While Kramerich's testimony is not offered on the issue of cause and origin, his opinion on defective design subverts the Plaintiffs' case.

Q: Okay. Have you designed—do you have a design that cures the defects that you posit in either the circuit on Page 1 of the T or the circuit on Page 2 of the T?

A: I don't want to go too far with this. We're not talking about a defect, and I'm not alleging either of these designs is a defective design. What I'm saying is that there is a *potential* for component failure in the design which *can* lead to a problem. And it's the design—it's the consideration given to what happens if there is a failure that leads me to conclude that either of these designs would have worked with a thermal cutout, because in either case you would have shut off the electricity.

So if you bought a 29–cent part and it failed, you got a 29–cent thermal cutout that shuts everything off and it doesn't work anymore and the consumer is safe. So I'm not alleging this is a stupid design or it's a defective design, what I'm saying is that there are failure modes in this design that can lead to problems.

Q: All right.

A: And you can't put enough parts in there to eliminate that.

Q: Okay. Well, then I misunderstood your testimony. Let me just go back and ask you a question, maybe it will clear it up. Do you have an opinion to a reasonable degree of engineering probability that the design of the Black & Decker VP 130 as reflected either in Exhibit T, Page 1 or Exhibit T, Page 2, is defective?

A: Yes.

Q: And what's your opinion?

A: It's not.

(Id. at pp. 103–104.) (Emphasis added.)

Considering Dr. Kramerich's testimony as a whole, the Court concludes that this testimony shows at best the possibility of a failure mode on the part of all battery chargers but does not establish a probability as to the Black & Decker VP130 sufficient within the dictates of *Daubert.* As acknowledged in his deposition, there was no independent testing of the product in order to validate Dr. Kramerich's assertions that the Defendant's product could cause the battery to overheat and the plastic charger case to ignite. Rather, the expert's theory was based upon articles and documents which involved battery chargers of several types, made by varying manufacturers, all for the proposition that the "same technology" was applicable to the Black & Decker VP130 for the purpose of asserting this possible scenario with the alleged offending product. This extrapolation theory when coupled with the lack of any independent testing qualifies Dr. Kramerich's opinion as tenuous at best because "there is simply too great an analytical gap between the data and the opinion offered." *General Electric Co. v. Joiner,* 522 U.S. at 146, 118 S.Ct. at 519.

 The Sixth Circuit has also upheld exclusion of expert testimony where there was a lack of a reliable testing to validate the hypothesis. *Pride v. BIC*

*Corp.,* 218 F.3d 566, 577, 578 (6th Cir. 2000). Although that case involved expert testimony aimed at the cause and origin of the fire purportedly caused by a lighter, the Circuit affirmed the district court's decision to exclude the expert testimony for the following reasons:

> The failure of [plaintiff's] experts to test their hypothesis in a timely and reliable manner or to validate their hypothesis by reference to generally accepted scientific principles as applied to the facts of this case renders their testimony on the cause and origin of the fire inadmissible under *Daubert* and Federal Rules of Evidence 702 and 104.

*Id.* The same reasoning is applicable here and despite Dr. Kramerich's best attempts[6] to bridge the gap between his opinion and the data, his opinion is speculative, unreliable and cannot be deemed admissible in this instance.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56. When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts con-

---

**6.** Plaintiffs' proffer of Dr. Kramerich's affidavit of March 2002 cannot be considered by the Court to the extent his opinion contradicts his deposition testimony. Conflicts between affidavits and other evidentiary materials do not preclude summary judgment and the court may disregard the subsequent affidavit unless a legitimate reason is given for the discrepancy. *See Penny v. United Parcel Service,* 128 F.3d 408, 415 (6th Cir.1997)(party cannot create a genuine issue of material fact by filing an affidavit after summary judgment has been made, that contradicts the earlier deposition testimony); *Dotson v. U.S. Postal Service,* 977 F.2d 976, 978 (6th Cir.), *cert.*

*denied,* 506 U.S. 892, 113 S.Ct. 263, 121 L.Ed.2d 193 (1992) (party cannot rely upon an affidavit contradicting prior sworn testimony); *Reid v. Sears, Roebuck and Co.,* 790 F.2d 453, 460 (6th Cir.1986). Generally, however, a deposition is given more weight as it affords the opposing side an opportunity for cross-examination not available in an affidavit. To the extent that the subsequent affidavit contradicts the prior sworn testimony without explanation, the Court disregards these averments. *See also* 11 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE § 56.14[1][f] (3d ed.2001).

**1046**

tained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962). See e.g., *United States v. Hodges X–Ray, Inc.,* 759 F.2d 557, 562 (6th Cir.1985) and cases cited therein. The Court's favorable treatment of facts and inferences, however, does not relieve the nonmoving party of his responsibility "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the moving party satisfies his burden to show an absence of evidence to support the nonmoving party's case, *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552, the party in opposition "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Although the showing required of the nonmoving party by Rule 56 does not go so far as to require that all opposition evidence be in a form admissible at trial, the rule does require the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves...." *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553. General averments or conclusional allegations of an affidavit, however, do not create specific fact disputes for summary judgment purposes. See *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888–89, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990). Furthermore, unsworn statements and affidavits composed of hearsay and nonexpert opinion evidence, "do not satisfy Rule 56(e) and must be disregarded." See *Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 968–69 (6th Cir.1991) (quoting *State Mut. Life Assurance Co. of Am. v. Deer Creek Park,* 612 F.2d 259, 264 (6th Cir. 1979) and citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 1609 n. 17, 26 L.Ed.2d 142 (1970)). Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [ ] earlier deposition testimony." *Reid v. Sears, Roebuck & Co.,* 790 F.2d 453, 460 (6th Cir.1986) (citing *Biechele v. Cedar Point, Inc.,* 747 F.2d 209, 215 (6th Cir.1984)).

On a motion for summary judgment, the Court will consider "[o]nly disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. Nonmaterial facts will not be considered. Neither will the judge attempt to weigh the material evidence or determine its truth. *Anderson v. Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510. The judge's sole function will be to determine whether there is a genuine issue for trial such that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* (citations omitted).

Where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552 (equating the standard for a directed verdict under Rule 50(a) with the summary judgment standard of Rule 56). If the evidence is "merely colorable," or is "not significantly probative," the Court may decide the legal issue and grant summary judgment. *Anderson v. Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2510–

11 (citing *Dombrowski v. Eastland,* 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (per curiam) and *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)). " 'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' " *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. at 2511.

*B. Products Liability Claims*

■ Although codified in the Ohio Products Liability Act,[7] in order to establish a product liability claim it must be shown that:

(1) there was a defect in the product manufactured and sold by the defendant,

(2) the defect existed at the time the product left the defendant's control, and

(3) the defect was the direct and proximate cause of the plaintiff's injuries or losses

*Atkins v. General Motors Corp.,* 132 Ohio App.3d 556, 562, 725 N.E.2d 727, 731 (1999), citing *State Farm Fire & Casualty Co. v. Chrysler Corp.,* 37 Ohio St.3d 1, 5–6, 523 N.E.2d 489, 493 (1988). It is the Defendant's position that the absence of evidence to establish a causal link warrants summary judgment on all claims.

■ The trier of fact must be presented with the probability as to the cause of the plaintiff's injuries and not a mere possibility. *See Shumaker v. Oliver B. Cannon & Sons, Inc.,* 28 Ohio St.3d 367, n. 3, 504 N.E.2d 44, 46 (1986), citing, *Drew v. Indus. Comm'n,* 136 Ohio St. 499, 501, 26 N.E.2d 793 (1940). Without the expert testimony of either Dolence or Kramerich, coupled with the inadmissibility of the children's statements, the evidence which is admissible merely points to a possible cause. The evidence that the battery charger was plugged in, the buzzing noise heard by Milisa Knotts and seeing a wall in the dining room on fire do not establish causation. Even when coupled with the fire investigators' report, causation is tenuous because the fire investigators did not conclusively rule out juvenile firesetting but declined to list that possibility in their report out of respect for the family. They testified that even if such a determination had been further investigated it would not have altered their conclusion that the fire was accidental. Therefore, the conclusion of the fire investigation was not conclusive as to the cause.

Additionally, there was no admissible testimony by Dr. Kramerich to support the contention that the VP130 was defective or prone to igniting as he did not conduct tests to bolster his opinion but based it upon the technology generally utilized in all battery chargers.

In sum, the Plaintiffs have not met their burden of establishing proof of causation or a defect which is necessary in order to place this matter before the trier of fact. Having considered all of the competent evidence presented in this action, the Court finds that Defendant is entitled to summary judgment on all claims.

### CONCLUSION

For the reasons stated above, Defendant's Motion in Limine to Exclude Hear-

---

7. *See* OHIO REV.CODE § 2307 et seq.

say Statements of Children (Doc. No. 46) is granted. Defendant's Motion in Limine to Exclude Testimony of Plaintiffs' Experts (Doc. No. 47) is granted. Defendant's Motion for Summary Judgment (Doc. No. 45) is granted.

IT IS SO ORDERED.

### JUDGMENT ENTRY

For the reasons stated in the Memorandum Opinion filed contemporaneously with this entry, IT IS HEREBY ORDERED, ADJUDGED and DECREED that Defendant's motion in Limine to Exclude hearsay Statements of Children (Doc. No. 46) is granted.

FURTHER ORDERED that Defendant's motion in Limine to Exclude Testimony of Plaintiffs' Experts (Doc. No. 47) is granted.

FURTHER ORDERED that Defendant's Motion for Summary Judgment (Doc. No. 45) is granted.